UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
IN RE: TERM COMMODITIES COTTON  :     Master Docket No. 12-cv-5126 (ALC) (KNF)
FUTURES LITIGATION             :
                              :     **CLASS ACTION COMPLAINT**
                              :
This Document Relates To:  All Actions    :     **JURY TRIAL DEMANDED**
                              :
                              :
-------------------------------------------------------x

# SECOND CONSOLIDATED AMENDED COMPLAINT

Plaintiffs complain, upon knowledge as to themselves and their own acts,

and upon information[1] and belief as to all other matters, as follows:

## I.     SUMMARY OF ALLEGATIONS

1.     (a) In violation of the Commodity Exchange Act, 7 U.S.C. §§1, *et seq*.

("CEA"), Defendants (as defined in ¶¶12-17) manipulated and artificially inflated

the prices of

(b) the ICE Cotton No. 2 futures contract ("cotton futures contract")

expiring in **May** 2011 ("May 2011 Contract"), relative to the other prices alleged

hereinafter; and

(c)  the cotton futures contract expiring in **July** 2011 ("July 2011

Contract"), relative to the other prices alleged hereinafter.

---

[1] Plaintiffs' information includes the investigation of counsel based upon publicly available information about cotton prices, cotton futures deliveries, open interest, data on cotton exports and imports, other statistics, Intercontinental Exchange ("ICE") rules and amendments, Commodity Futures Trading Commission ("CFTC") reports, news articles concerning Defendants' executive changes and other issues, and other information.

(d) Allegations herein of Defendants' artificial inflation, manipulation or fixing of the prices of May 2011 Contracts refer to the March 30 – May 6, 2011 period, inclusive. Allegations of such conduct by Defendants towards July 2011 Contract prices refer to the period June 7 – July 7, 2011, inclusive. The period between March 30 and May 6, 2011, inclusive, and the period between June 7 and July 7, 2011, inclusive, are referred to herein as the "Class Period." Whenever artificial inflation is alleged, that means inflation relative to the fundamentals of supply and demand, the prices of the later futures contracts, and/or cash market prices, each as alleged in detail hereinafter.

2.     Defendants' manipulation also violated Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2, and artificially inflated the fixing of the prices of cotton on call contracts alleged in ¶¶112-118.

3.     Cotton is seasonal. Cotton supplies in the United States tend to be the highest after the harvest or picking is substantially complete in September. Cotton supplies in the United States tend to be the lowest at the end of July before any substantial picking of the new crop begins. One of the promised societal benefits of cotton merchants and cotton futures contract trading is that they efficiently and economically allocate the substantial supplies of cotton in September in a manner that provides the lowest price of cotton throughout the year.

4.     (a) But Defendants uneconomically insisted in the May 2011 Contract upon the highest number of stops of deliveries (which means that Defendants received cotton) relative to the amount of certificated cotton stocks in ICE warehouses in the history of cotton futures trading on ICE.

(b) Specifically, Defendants, through Defendant Term Commodities, Inc., stopped 3,898 May 2011 Contract deliveries in satisfaction of Defendants' long positions in the May 2011 Contract.  See ¶20 *infra* (defining "long position") and ¶¶42-44 (particularizing the deliveries).  This was **99.23%** of all deliveries on such contract.

(c) The deliveries taken by Defendants alone on the May 2011 Contract were **2.02** times the certificated cotton stocks at the start of the notice period.  This was 56% greater than the next highest ratio of (i) **all** deliveries made in any prior ICE contract to (ii) the amount of certificated stocks in the ICE warehouse at the start of the notice period.

(d) Abnormal differences between the price of one futures contract on a commodity and the price of a later-expiring futures contract for that same commodity, are the most important or among the most important indications of price manipulation.  A substantial "backwardation"[2] is a classic indicator of a

---

[2] A "backwardation" is a condition in which the price of the earliest expiring futures contract price exceeds the prices of later expiring futures contracts. In contrast to a backwardation, a "carrying charge" means that the price of the later expiring futures contracts are higher than the

manipulation undertaken by a large long trader who takes a large amount of deliveries relative to the deliverable supply of the commodity in delivery warehouses.

(e) Defendants engaged in long-term uneconomic conduct in the cotton cash and futures market in order to take this record ratio of deliveries. Such long-term uneconomic conduct caused an anomalous U-turn in the backwardation of the May 2011 Contract prices relative to July 2011 Contract prices during a time period when fundamental factors should have caused a continued decline in this backwardation. It caused the highest percentage backwardation and the highest absolute backwardation of any May-July Contract in the history of cotton futures trading for the time period of April 1 – May 6 of each year from 2000 – 2011, inclusive.

(f) The system of futures contract trading in the United States is designed to facilitate the ease of trading and **avoid** deliveries. See ¶¶ 17-24 *infra*. After "backwardation," another indication of manipulated futures contract prices in the United States has been that futures contract prices diverge from the cash market price as the futures contract moves closer to the month before trading ends. As time progresses and each futures contract moves towards its final trading month,

price of the earliest expiring futures contract. This is called a "contango" or, often, a "carrying charge" market because the somewhat higher prices of the deferred contracts, compensate the holder of the commodity for the "carrying charges" of continuing to store the commodity (here, cotton) until the later delivery dates.

there is less of a "predictive" or "anticipatory" component of the futures price. Accordingly, non-manipulated futures contract prices and cash market prices should tend to converge during the month before the end of trading in a given contract.

(g)  By insisting upon taking their record ratio of deliveries of May 2011 Cotton Contracts relative to the certificated supplies in the warehouse, Defendants caused (i) a record **non**-convergence between the May 2011 Contract price and cash market prices, and (ii) an anomalous distortion between May 2011 prices and the fundamentals of supply and demand.  See ¶¶ 53-85 *infra*.

(h) Thus, Defendants' long-term uneconomic conduct culminating in their record ratio of deliveries on the May 2011 Contract caused record distortions of prices and uneconomic conditions in which the May 2011 Contract blatantly violated the overriding "convergence" objectives (see sub-par (f)-(g) above) of United States futures contract trading.  This is the type of abuse of market power by a large trader that Congress originally enacted the CEA to prevent and has been seeking through amendments to the CEA to eliminate since the inception of the CEA.

5.  (a) Also, Defendants, through Defendant Term Commodities, Inc., then topped their own record set in the May 2011 Contract by uneconomically

insisting upon an even greater amount of stops of deliveries **relative** to certificated stocks on the July 2011 Contract. ¶¶ 42-44.

(b) Specifically, Defendants stopped 1,613 July 2011 Contract deliveries in satisfaction of their long positions in the July 2011 Contract. This was **99.01%** of the stops of deliveries on the July 2011 Contract.

(c) Defendants' stops of deliveries on the July 2011 Contract alone were **2.04** times more than the certificated stocks at the start of the notice period.

(d) Defendants' engaged in long-term uneconomic conduct in the cotton cash and futures market in order to take this record ratio of deliveries. Such long-term uneconomic conduct caused an anomalous "U-turn" in the "backwardation" (as alleged in fn. 2) between the prices of July 2011 Contracts and the prices of the next two cotton futures contracts.

(e) From March 2011 forward, there had been net cancellations of exports of cotton. See allegations in fn. 5 *infra* re "net cancellations of exports." These added to the supply of cotton and reduced the demand for cotton. Consistent with these and other changes in the fundamentals of supply and demand for cotton (¶73), the backwardation between the July 2011 Contract price and the prices of the next two expiring futures contracts (the October 2011 and December 2011 Contracts) declined between March and early June 2011.

(f) However, Defendants' long-term uneconomic conduct (*see* ¶¶4(a)-(h); 5(a)-(d); 42-44; 52(a)-(u); 61(a)-(i)) culminating in their threatened and actual insistence on high amounts of deliveries on the July 2011 Contract, caused the backwardation to do a U-turn. Anomalously, this occurred even as the net cancellations of exports continued and other changes in the fundamentals of supply and demand indicated that the backwardation should decline.

(g) Defendants caused this backwardation (see fn. 2) between the July 2011 Contract price and the prices of the next two expiring futures contracts (the October 2011 and December 2011 Contracts) to become higher than the backwardation between any same year July-October contract prices or any same year July-December contract prices for the period from June 1 – July 6 of each year from 2000 – 2011, inclusive.

(h) In fact, Defendants' record ratio of deliveries also artificially created and intensified a **non**-convergence between the July 2011 Contract prices and cash market prices. Indeed, during the time period of June 1 – July 6 for the twelve years of 2000 through 2011, the **top thirteen** highest spreads between the July cotton futures contract and the cash market cotton price were **all** in the July 2011 cotton futures contract. The largest spread during the Class Period was reached on June 23, 2011. It was **almost five times** more than the highest spread

in all the years prior to 2011, going back to 2000. It was **more than ten times** the average spread price during the same, 2000-2010 time period.

(i) This gross distortion to record non-convergence and unprecedented spreads, exactly when prices should have been converging, is yet another extreme badge of manipulation.

(j) In causing all the foregoing extreme distortions, Defendants intentionally manipulated and inflated July 2011 contract prices. As in the May 2011 Contract, Defendants also intentionally exacerbated and abused the pre-existing conditions of relatively low supplies and capacity constraints that further reduced the amounts of cotton that could be delivered on the futures contract. *See* ¶¶36(a)-(i) *infra*.

(k) Defendants uneconomically also substantially depleted the available deliverable cotton on the May 2011 Contract and the July 2011 Contract. *See* ¶¶36(g)-(h), 42(d), 44(b), 52(b) *infra*.

6.      (a) The potential for a congestion or squeeze depends on the difference between the open interest and the available deliverable cotton supplies. Defendants' foregoing depletions of the available deliverable cotton supplies, Defendants' increases in the open interest of the May and July 2011 Contracts, and Defendants' taking of large deliveries created and exacerbated a congestion and squeeze in such Contracts. *See* ¶¶4(a)-(d), 52(a)-(u), 61(a)-(i).

(b) Defendants uneconomically refused to deal with market participants in the multiple active cash markets in which higher quality cotton was being actively and repeatedly offered to Defendants at lower prices than May or, later, July 2011 Contract prices. *See* ¶¶53-63 *infra* (regarding EFP liquidations of Defendants' long futures positions).

(c) Defendants, through their May 2011 Contract long positions, uneconomically caused the liquidation of the May 2011 Contract to be greatly delayed. *See* ¶¶52(a)-(u) *infra*. This caused the May 2011 Contract open interest to be 30% -379% higher than the average open interest for prior May contracts during the history of ICE trading between the 13th trading day (which was April 5 in 2011) before FND and FND (which was April 25 in 2011). *Id.* Defendants' uneconomic refusals to liquidate their July 2011 Contracts also caused delays in the liquidation of that contract and increases in its open interest. *See* ¶¶6(e), 52(q)-(s) *infra*.

(d) Defendants' long positions also caused the open interest on the May 2011 Contract to increase on **eight of the twelve trading days** between the 25th day before FND and the 12th day before FND compared to **zero** such **increases** in the average open interest in the May contracts over that same period during the prior history of ICE trading. *See* ¶¶52(a)-(u) *infra*.

(e) By virtue of Defendants' foregoing substantial depletions of deliverable supplies, substantial increases in open interest of the May and July 2011 Contracts, and taking of substantial deliveries, Defendants' long positions well exceeded available deliverable supply (*see* ¶¶36(a)-(i), 52(a)-(u)) and forced Class members to deal with Defendants in a congested May 2011 Contract and a congested July 2011 Contract. Defendants refused to liquidate their long positions except at artificially inflated May and July 2011 Contract prices. *See* ¶¶36(a)-(i); 52(a)-(u) *infra*.

(f) Defendants themselves, through their long-term systematic uneconomic conduct, thereby caused and exacerbated congestions and a manipulative squeeze in each such Contract. *See* ¶¶4(a)-(h); 5(a)-(d); 42-44; 52(a)-(u); 61(a)-(i) *infra*. Indeed, Defendants thereby caused "the largest ever cotton squeeze" and the "worst thing that ever happened" to the cotton market in, first, the May 2011 Contract and, later, the July 2011 Contract. Gregory Meyer & Javier Blas, *Traders Cause Cotton Chaos With Bulk Deliveries*, FINANCIAL TIMES, September 25, 2011, www.ft.com/intl/cms/s/0/fec1a026-e77c-11e0-9da3-00144feab49a.html#axzz2Gqj9R5wp.

(g) In addition, and inextricably intertwined with the foregoing squeeze that Defendants intentionally engineered on these two successive ICE futures contracts, Defendants also systematically engaged in uneconomic conduct

in violation of the customs and practices of cotton futures market participants, including cotton merchants. *See* ¶¶4(a)-(h); 5(a)-(d); 29(o); 42-44; 52(a)-(u); 61(b)-(i)); 78(b) *infra*. Because Defendants purported to be hedgers, this systematic uneconomic conduct also violated the law, including CFTC Regulation 1.3(z), 17 C.F.R. §1.3(z)(1)(iv): "[N]o transactions or positions shall be classified as bona fide hedging unless…such positions are established and liquidated in an orderly manner in accordance with sound commercial practices…."

(h) Therefore, Defendants' long positions were unlawfully large to the extent that they exceeded the speculative position limit. *See* ICE Futures U.S. Rule 6.19 (300 contract limit on FND) and ¶¶52(s)-(t). In fact, Defendants unlawfully held long positions was as much as thirteen times more than the position limit. By the uneconomic and unlawful conduct alleged in this subparagraph alone, Defendants manipulated and artificially inflated May 2011 and July 2011 Contract prices.

(i) As a direct and proximate result of Defendants' foregoing manipulation and unlawful conduct, and the resulting price distortions, Plaintiffs and Class members suffered actual damages and were damaged in their property.

## II.   <u>JURISDICTION AND VENUE</u>

7.      Cotton is a "commodity" and is the "commodity underlying" cotton futures and options contracts traded on the Intercontinental Exchange ("ICE"). The

ICE operates the ICE Futures U.S in this District. ICE Futures U.S. is a designated contract market pursuant to the Commodity Exchange Act ("CEA"), as amended, and, as such, is regulated by the Commodity Futures Trading Commission ("CFTC"). See Sections 1a(4) and 22 of the CEA, 7 U.S.C. §§ 1a(4) and 25(a)(1)(D), respectively.

8.     The ICE Futures U.S.'s headquarters are located at 1 North End Avenue, New York, NY 10282. Venue is proper in this District pursuant to Section 22 of the CEA, 7 U.S.C. § 25(c), because the claims arose in this District. Defendants' unlawful acts manipulated the prices of the Cotton futures contracts traded on the ICE.

9.     This Court has jurisdiction over this action pursuant to Section 22 of the CEA, 7 U.S.C. § 25, and 28 U.S.C. §§ 1331 and 1337.

10.     The Defendants, directly and indirectly, made use of the means and instrumentalities of transportation or communication in, or the instrumentalities of, interstate commerce, or of the mails in the connection with the unlawful acts and practices and course of business alleged herein.

### III.   PARTIES

#### A.   Plaintiffs

11.     (a)     Plaintiff Mark Allen entered a short position in the May 2011 Contract as part of a spread position with a long position in the July 2011 Contract.

Plaintiff Allen lost in excess of $57,000 and suffered actual damages by paying the artificially high prices caused by Defendants in order to liquidate such May 2011 Contract short position, and by liquidating the spread position by April 29, 2011. Defendants' manipulation and artificial inflation of the prices of cotton futures contracts proximately caused Plaintiff Allen losses, injury to his property and actual damages.

(b)     Plaintiff Stuart Satullo purchased 15 May contracts on April 11, 2011 in order to liquidate a short position in the May Contract and purchased 2 July Contracts on June 13, 2011 in order to liquidate a short position in the July Contract.  Plaintiff Satullo paid the artificially high prices caused by the Defendants on both such liquidations. Thereby Defendants' manipulation and artificial inflation of the prices of cotton futures contracts proximately caused Plaintiff Satullo losses, injury to his property and actual damages.  (Plaintiff Satullo also had a net loss on such transactions of in excess of $344,000.)  Plaintiff Satullo had additional short positions in May Contracts and July Contracts that were roughly balanced against option positions in such contracts and that were liquidated by April 11, 2011 in the May Contract and June 13, 2011 in the July Contract.

**B.    Defendants**

12.     Defendant Louis Dreyfus Commodities B.V. (sometimes herein, "LDC") trades and markets commodities, including cotton, on an international basis.  The LDC group's cotton platform conducts operations in all major world markets, including origination in key producing regions of the United States and other countries.  LDC originates approximately 20% of United States cotton production.  LDC's main office is located in Rotterdam, the Netherlands, and is owned, directly or indirectly, by Louis Dreyfus Holding B.V.

13.     (a) Defendant Allenberg Cotton Co. ("Allenberg") is the name by which Defendant LD Commodities Cotton LLC a/k/a Allenberg Cotton Co., is doing business.  Allegations herein relating to Allenberg are also allegations against LD Commotites Cotton LLC which is, directly or indirectly, a wholly owned division or subsidiary of LDC or another Defendant, and is one of the largest cotton merchandising organizations in the world.  LD Commodities Cotton LLC a/k/a Allenberg Cotton Co. is a Delaware limited liability company whose principal place of business is located at 40 Danbury Road, P.O. Box 810, Wilton, CT 06897-0810.  Allenberg has offices in Cordova, Tennessee and Fresno, California.

(b) Additionally, of those forty ICE approved warehouses, Allenberg owned 14 of them representing 35% of the warehouses.  The company with the next highest number of warehouses was Ecom, which owned 5.  Allenberg's

ownership of ICE approved cotton warehouses in 2011 represented 39% of the total ICE approved cotton warehouse storage capacity. The company with the next highest capacity was Ecom, which owned 13% of the total capacity. In other words, Allenberg owned 3 times the storage capacity as the next largest warehouse owner.

(c) LDC Holding Inc. is a Delaware corporation whose principal place of business is located at 40 Danbury Road, P.O. Box 810 Wilton, CT 06897-0810. Claude Ehlinger is the executive vice president LDC Holding Inc. and the chief financial officer of Defendant Louis Dreyfus Commodities B.V. Defendant LDC Holding Inc. is, directly or indirectly, owned and controlled by Defendants Louis Dreyfus Commodities B.V. and owns and controls, directly or indirectly, Defendant LD Commodities Cotton LLC a/k/a Allenberg Cotton Co.

14.     Defendant Term Commodities, Inc. is a subsidiary of LDC. Term Commodities is a clearing member on the InterContinental Exchange, Inc. ("ICE"), the Chicago Board of Trade ("CBOT"), the Chicago Mercantile Exchange ("CME"), and the New York Mercantile Exchange ("NYMEX"). Term Commodities is located in Chicago, Illinois. Term Commodities does not act for public customers. It acts for the other Defendants and their affiliates.

15.     Defendant Louis Dreyfus Commodities LLC is a holding company for various operating companies engaged in the North American business with the

Louis Dreyfus Commodities group of companies. Louis Dreyfus Commodities LLC's main office is located in Wilton, Connecticut.

16.     Defendant Joseph Nicosia ("Nicosia") was the Chief Executive Officer of Allenberg, at all times relevant herein, and handled the day-to day running of Defendant Allenberg, was the Senior Platform Head Cotton trader of the Louis Dreyfus Commodities Executive Group within Louis Dreyfus Commodities Holdings BV and LDC, and was and is a member of Louis Dreyfus Commodities' executive committee. Nicosia was also a manager of LDC Holding Inc. According to Bloomberg, Defendant Nicosia, who was in charge of Defendants' cotton futures trading, also serves as a Director of both the New York Board of Trade and the American Cotton Shippers. Defendant Nicosia served as a Member of Board of Governors of ICE Futures US (formerly, New York Board of Trade). Mr. Nicosia also is a founding member and director of The SEAM, the cotton industry's internet trading marketplace.

(a) In participating in the ICE cotton futures market, Defendants were subject to the customs, practices, and legal requirements imposed upon such participants. *See* ¶¶6(g)-(h), 21(d), 52(t), 61(b) *infra*. The CFTC investigated Defendants' participation, under Defendant Nicosia, in the May and July 2011 Contracts. *See* ¶138(c) *infra*. The instant lawsuit, alleging violations of law by

Defendants when Defendant Nicosia was in charge of the day-to-day activities of Defendants, was filed on June 29, 2012.

(b) After the commencement of the CFTC investigation and the commencement of this lawsuit, the following executive changes occurred with respect to Defendant Allenberg:  (1) On or about September 10, 2012, Anthony Tancredi, who was president of Allenberg, second in command to Defendant Nicosia, and responsible for global merchandising, left Allenberg; (2) On or about October 26, 2012, approximately six weeks after Tancredi's departure, Defendants removed Nicosia as CEO of Allenberg and replaced him with Tancredi.  As part of Tancredi's return he took over Defendant Nicosia's former roles – CEO of Allenberg and Senior Platform Head Cotton trader of the Louis Dreyfus Commodities Executive Group within Louis Dreyfus Commodities Holdings BV and LDC; (3) On or about January 11, 2013, Chief Operating Officer and 40-year Allenberg veteran Thomas Malone was promoted to President of Allenberg (second-in-command of Allenberg and Tancredi's former position).  As President of Allenberg, Malone took over some of Nicosia's day-to-day responsibilities as well.

17.     Defendants John Does "1"-"10" are other persons, whose identities are unknown to Plaintiffs.  John Does "1"-"10" include but are not limited to affiliates or associates Defendants Louis Dreyfus Commodities B.V., Louis

Dreyfus Commodities LLC, LDC Holding Inc., Term Commodities Inc., Allenberg Cotton Co., and Joseph Nicosia. The John Doe defendants agreed to and did work with the specifically named defendants to manipulate prices of May 20ll Contracts and July 2011 Contracts, and otherwise accomplish the violations alleged herein. The specifically named defendants and the John Doe defendants are referred to herein collectively as the "Defendants."

## IV. SUBSTANTIVE ALLEGATIONS

### A. Background

18.     **Futures Contract**.  A futures contract is an agreement to buy or sell or to make a cash settlement according to a formula in the contract in respect of a commodity, such as cotton, at a date in the future.  In practice, only a very small percentage of all futures contracts traded each year are satisfied by delivery of the underlying commodities.

19.     **Offset By Trading**.  Rather, futures market participants almost always offset their futures positions before their contracts mature. For example, a purchaser of one cotton futures contract may cancel or offset her future obligation to take delivery of cotton, by selling one cotton futures contract. This sale of one contract offsets or liquidates the earlier purchase of one contract.  The difference between the initial purchase price and the sale price represents the realized profit or

loss for the trader. Futures traders also frequently couple such liquidations with "roll" trades. *See* ¶¶51-52.

20. **"Long" and "Short."** Thus, futures contracts have two sides. The "long" side is the buyer of the contract. In the rare event that the long does not offset or liquidate, the long is obligated to take delivery and pay for the commodity or make the cash settlement in accordance with the terms of the futures contract. The "short" side is the seller of the contract. In the rare event that the short does not enter an offsetting trade, the short is obligated to make delivery of the commodity during the delivery dates or make the cash settlement in accordance with the terms of the contract.

21. However, the commodity exchanges and the Commodity Futures Trading Commission have repeatedly stated that futures markets are not intended to be substitutes for the physical market. Instead, the futures markets are carefully designed to facilitate ease of trading into and out of futures contract positions without deliveries. As a result, liquidations and cash settlements occur on 99-plus percent of futures contracts, and deliveries are extremely rare.

(a) The amount of the certificated stocks in the ICE warehouses averaged 2.5% of the amount of open interest in ICE cotton futures contracts between 2006 and 2013. When the May 2011 Contract became the active contract, its open interest during March and the first half of April was approximately **35**

**times** as great as the certificated cotton stocks in ICE warehouses.  When the July 2011 Contract became the actively traded contract, its open interest was, initially, **35 times** as great as the ICE certified stocks.  But Defendants revealed their large decertifications on June 1-2, 2011 and the ratio then more than tripled to 115:1:

| Date | ICE Certificated Stock (in Bales) | July 2011 Open Interest (in Contracts) | Ratio of Open Interest to Certificated Stock |
|---|---|---|---|
| 5/25/2011 | 183533 | 68,982 | 37.58561131 |
| 5/26/2011 | 188042 | 66,328 | 35.27297093 |
| 5/27/2011 | 190030 | 64,952 | 34.17986634 |
| 5/31/2011 | 194333 | 65,026 | 33.46112086 |
| 6/1/2011 | 194715 | 63,431 | 32.57632951 |
| 6/2/2011 | 52035 | 60,215 | 115.7201883 |
| 6/3/2011 | 43207 | 57,322 | 132.6683176 |
| 6/6/2011 | 43057 | 54,951 | 127.6238475 |

(b) The above data shows that delivery on all outstanding open interest was not practical or even possible.

(c) Consistent with the fact that futures markets are not intended to be substitutes for the physical market, it is not expected that a multiple of the stocks in the warehouse of even twice as much, let alone 20-50 times as much, would be ordered for delivery on each succeeding contract by the shorts more than nine weeks before the Last Notice Day in such contract.  Requiring such massive

movements of cotton would be a great "dead weight" loss to the economy, needlessly burden the shorts, and would eventually destroy the futures contract.

(d) On the contrary, the customs, practices, and legal requirements imposed upon futures market participants is that they act in a commercially reasonable fashion. *See* ¶¶6(g)-(h), 52(t), 61(b). These requirements are especially strict for persons who hold futures positions that exceed the speculative position limit, *i.e.*, so called hedgers. *See* ¶6(g)-(h).

22. The insistence by "longs" on stopping (that is, taking) significant deliveries to satisfy expiring futures contracts, does not make economic sense in various circumstances. These include where the price of the expiring futures contract is more than the prices of the deferred futures contracts, or more than the price of purchasing cotton in the cash market. See ¶¶ 34-36. 63. 71, 78(d).

23. "Spread positions" are commonly used positions. Typically, in a spread position, the trader is long a futures contract for one delivery month and short the same futures contract for another delivery month. For example, with respect to cotton, Plaintiff Allen was short the May 2011 Contract and long the July 2011 Contract during April 2011.

24. "Spreads" may refer to the price differential between any two items. For example, "spreads" refers to the price differences between futures contracts on the same item only with different expirations. Thus, if the May 2011 Contract

were priced at $2.50 per pound and the July 2011 Contract were priced at $3.00 per pound, then the "spread" would be .50¢; if the July 2011 Contract were priced at $2.50 per pound and the December 2011 Contract were priced at $2.60 per pound, then the spread would be .10¢ per pound. Similarly, "spreads" may refer to the difference between the cash market price and the futures market price. If the July 2011 Contract price was $2.50 per pound and the cash market price was $2.46 per pound, the spread would be 4 cents.

25.     ICE Futures U.S. has been designated by the CFTC as a contract market pursuant to Section 5 of the CEA, 7 U.S.C. § 7. ICE Futures U.S. submits to the CFTC various rules and regulations for approval through which the ICE designs, creates the terms of and conducts trading in various commodity futures and options, including futures and options contracts for cotton.

26.     ICE trades cotton futures contracts expiring in March, May, July, October and December of each year.

27.     Every aspect of a futures contract traded on the ICE, such as the grade and amount of cotton, is standardized, except the price and delivery month. This standardization of futures contracts is specifically designed to facilitate the ease of trading of fungible contracts in one central market place.

28.     Prices of ICE cotton futures contracts are quoted in cents and hundredths of a cent per pound. The contract size for ICE cotton futures contracts is 50,000 pounds net weight.

29.     ICE Cotton No. 2 rules specifies that the Official Cotton Standards of the United States existing on the date of delivery shall be used as the standards for the grade, staple, quality or value of all cotton delivered on a contract for future delivery.  *See* ICE Futures U.S. Cotton No. 2 Rules, Rule 10.03 (Official Standards and Undeliverable Cotton).

(a) Not only are deliveries extremely low and rare relative to the volume and open interest of ICE cotton futures contracts.  *See* ¶21(a).  ICE delivered cotton is ill-suited for the efficient satisfaction of obligations in the cotton cash markets.  There is an extraordinarily wide variety of cotton deliverable on the ICE contract.  This includes but is not limited to rain-grown cotton, non-rain grown cotton, different colors of the cotton, different grades of cotton, and different times and locations of the delivery.

(b) Thus, under ICE rules shorts have the option to deliver cotton of one of 36 combinations of leaf and color grade, at one of forty widely dispersed warehouses, in one of five widely dispersed locations, (between the mid-Atlantic and the southernmost Gulf of Mexico) during a time band that merely begins the

running of a clock that will continue for up to 63 days longer after the long asks to extract the cotton it receives from the ICE warehouses.

(c) ONLY U.S. rain-grown or U.S. non-rain grown cotton is deliverable against the ICE contract. Rain-grown or EMOT cotton comes from the Eastern, Memphis, (New) Orleans and Texas regions ("EMOT"). Non-rain grown cotton which is referred to as Far Western Upland Cotton is grown in CA, NV, AZ, NM (except Lea County), El Paso and Pecos Valleys of TX.

(d) The very wide variety of the qualities of cotton deliverable against the ICE Cotton No. 2 Futures Contract, includes eight color grades.

| White Grades | Light Spotted Grades |
|---|---|
| Good Middling | Good Middling Light Spotted |
| Strict Middling | Strict Middling Light Spotted |
| Middling | Middling Light Spotted |
| Strict Low Middling | |
| Low Middling | |

(e) Further, Leaf Grades 1 through 5 are deliverable for white cotton and Leaf Grades 1 through 3 are deliverable for light spotted cotton.

(f) Under the ICE rules, there is also a wide dispersion from the mid-Atlantic to the southernmost Gulf of Mexico in the geographic location of warehouses where a short could deliver cotton. In 2011 the forty ICE approved warehouses were spread over five designated delivery points: Galveston, Texas; Greenville, South Carolina; Houston, Texas; Memphis, Tennessee; New Orleans,

Louisiana (New Orleans is effective with respect to all delivery months through and including October 2013). Furthermore, each of these five locations, as per ICE rules, includes all areas within a 15 mile radius from the city's limits.

(g) Thus, shorts have the option to deliver one of 36 combinations of leaf and color grade, at one of forty warehouses, in one of five different locations.

(h) To the limited extent that deliveries may be made on any futures contract, shorts have a strong financial incentive to deliver the least valuable grades and colors of cotton at the least valuable locations at the least desirable times. Longs have no control over the quality or color or location of cotton they receive nor the exact time of receipt.

(i) This provides an incentive for the rational market participant to source cotton from the multiple cash markets. There, the rational person may select the exact color and quality of cotton they want, the exact location, and the exact times that most efficiently satisfy their obligations or requirements. Customs and practices among market participants (including cotton merchants) is to seek to obtain for the lowest price the right color and grade of cotton at the right place at the right time. *See* ¶¶6(g)-(h), 21(d), 52(t), 61(b).

(j) Consistent with the foregoing, and because of the wide dispersion of quality and location of cotton deliverable against the ICE Cotton No. 2 Futures Contract, the International Cotton Association ("ICA") export cotton contracts are

typically never based upon a requirement of an ICE cotton futures contract (nor the predecessor cotton futures contract).

(k) The overwhelming majority of U.S. cotton is exported under contracts subject to ICA bylaws and rules.

(l) ICA export contracts have always typically included detailed quality parameters that are significantly more restrictive than the wide band available under the ICE cotton futures contract.

(m) Indeed, for the past 25 years, active cotton merchants have never seen an ICA cotton contract that required delivery of merely ICE or other futures exchange certificated cotton.

(n) On the contrary, the wide band of qualities, colors, locations and other variables under the ICE cotton futures contract, disqualifies the ICE futures contract from serving as an efficient source of export cotton.

(o) Although *any* cash market contract specifying ICE certificated cotton would be contrary to efficient merchandising of cotton and ICE customs and standards, such a contract would be extremely useful for supplying a long with a (pretextual) rationale to insist upon large deliveries in order to create or exploit a congestion or otherwise inflate futures contract prices. *See* ¶¶16(a)-(b) above (regarding Defendants' executive changes after the filing of this action) and ¶¶5(e),

(f), 36(e), 53, 74-79 (regarding the large cancellation of export orders immediately after the July 2011 Contract ended).

30.     Thus, in the rare event that a cotton market participant holds its positions to the end of trading in the prompt-month contract, the longs must stop or take delivery and shorts must make delivery of 50,000 pounds net weight per contract as alleged above.   The price for the cotton that is delivered is the settlement price of the ICE Cotton No. 2 contract.  The difference between that and each trader's original price has been adjusted for, through variation margin payments.

31.     All ICE warehouses for cotton are required to load-out cotton within nine weeks from the date of receiving a valid load-out order.

(a) As with the foregoing friction in extracting cotton from ICE warehouses, there is similar friction in extracting cotton from non-exchange cotton warehouses.  There was typically a substantial amount of time, up to nine weeks, from the time of the load out order to the non-ICE warehouse, to the time the cotton was extracted.

(b) The USDA's Commodity Credit Corporation ("CCC") is a government-owned and operated entity which aids producers through loans, purchases, payments, and other operations, and makes available materials and facilities required in the production and marketing of agricultural commodities.

Cotton warehouses must provide data to the CCC on shipments and storage capacity on a weekly basis. Cotton warehouses must load-out stored cotton "without unnecessary delay" which means at least 4.5% of its applicable storage capacity per week. Common tariffs for such warehouses provide that a cotton warehouse need load out only 4.5% of its capacity per week.

(c) Requests for load-outs from third-party warehouses (non-ICE licensed warehouses) were at a substantial level during February-June 2011.

(d) After the cotton was extracted from a non-ICE warehouse, it had to be shipped to an ICE warehouse. Depending upon the location, this process typically required days or weeks.

(e) After the cotton was loaded out and transported to ICE warehouses, the ICE rules in effect during March-July 2011 required that the cotton had to be certificated by the USDA. The amount of time required for such certification varied. During April-May 2011 and June-July 2011, the amount of time required for this certification was unusually long. On the May 2011 Contract, it grew to more than two weeks, which was much longer than usual. ¶31(g)-(j).

(f) The Last Notice Day on the July 2011 Contract was July 14, 2011, and on the May 2011 Contract was May 13, 2011. At least nine weeks before the Last Notice Day---that is, approximately March 11, 2011 for the May 2011

28

Contract and approximately May 12, 2011 for the July 2011 Contract---it was no longer feasible for market participants to plan to order load-outs of cotton from non-ICE warehouses and move that cotton into the ICE warehouse in time to make a delivery by the Last Notice Day.

(g) After the CFTC investigation and the commencement of this action, ICE announced, on March 4, 2013, new rule changes to the ICE Cotton No. 2 futures contract. According to ICE, Cotton Resolution No. 2 to Chapter 10 (which is the new rule) is designed to reduce the amount of time it takes to move cotton into a "tenderable position" by reducing bottlenecks and frictions in the process of moving cotton into delivery warehouses and certificating it. "Tenderable position" means that a market participant could tender a warehouse receipt in respect of that cotton under ICE rules and, for example, thereby satisfy a short position.

(h) Compared to the conditions actually existing during April-May and June 2011, this rule change alone shortened the time to make delivery by approximately as much as two weeks.

(i) Under the old ICE rules, the owner of cotton moved into an ICE warehouse requested the ICE warehouse owner/agent to request certification from the USDA of such cotton, at which time the USDA includes this bale in its daily

report of bales pending Certification. Samples must be cut at the licensed store and then moved to the USDA classing office where they are subject to potential backlogs. The USDA eventually undertakes and completes the process and provides the results of same to ICE. If there is certification, the ICE removes the bale from its daily report of bales pending Certification and adds the bale (if it meets ICE standards) to ICE's daily Certified Stocks Report.

(j) Because of these backlogs, the amount of time required from the time the owner requested that the USDA classing office undertakes the process, and the time when the USDA completed the process and provides the results to the Exchange, varied and was subject to delays and bottlenecks. Once Defendants intended to cause a high ratio of deliveries relative to certificated stocks, Defendants well knew (but the rest of the market did not), that Defendants' conduct could (and, in fact, did) create just such a bottleneck, slow the certification process, and thereby effectively further reduce the available deliverable supply.

## B. __Manipulation__

32.     The social benefits that justify commodity futures trading, are (a) price discovery, (b) efficient risk-transfer, and (c) price stabilization. *Cargill, Inc. v. Hardin,* 452 F.2d 1154, 1156-58 (8th Cir. 1971).

33.     Price manipulation destroys all three of these benefits. *Cargill*, 452 F.2d at 1156-8. Defendants' long-term uneconomic conduct culminating in their

insistence upon record numbers of deliveries relative to ICE warehouse certified stocks, caused record non-convergence between futures and cash market prices, record backwardation in the futures market, and a dramatic separation of the futures prices from the fundamentals of supply and demand for cotton. Thereby, Defendants destroyed the social benefits of cotton futures contract trading in order to benefit Defendants.

34. **Uneconomic Conduct**. Standard practice among market participants (and other business entities) is to purchase a commodity for the lowest price available, all other things equal, and sell the commodity for the highest price available, all other things equal. Firms acting in accordance with this standard practice are said to be acting in an "economic" or "economically rational" manner. Firms who violate this standard practice are said to be acting uneconomically. Pursuant to their manipulative scheme alleged herein, Defendants repeatedly engaged in highly unusual violations of this standard practice by seeking uneconomically to overpay to purchase cotton by taking delivery on, first, the May 2011 Contract and, later, the July 2011 Contract.

35. Efficient risk-transfer and the other social benefits of futures trading alleged in ¶¶31-32, cannot be realized in a regime in which uneconomic deliveries cause non-convergence of cash and futures prices. In such a regime of uneconomic deliveries and non-convergence, each hedger would have to maintain

a "double book."  For every short position, the hedger would have to keep certificated supplies that could be used to deliver in order to liquidate the short futures positions---and avoid having to liquidate at non-converging futures prices. For every long position, the hedger would have to maintain the substantial spare cash and credit necessary to take delivery and purchase the entire amount of the commodity represented by the long futures position---and thereby avoid having to liquidate at non-converging futures prices.  Maintaining such "double books" would enable hedgers to exit a hedging futures position without sustaining large losses.  But maintaining such double books would be extremely expensive, and make the economic cost of hedging in the futures market outweigh the benefits.

36.     Furthermore, in a regime of uneconomic deliveries and non-convergence, the futures contract would be useful only as a hedge for ICE-warehouse cotton, and not for out-of-position cotton.  However, warehouse stocks represent only a small fraction of the overall total cotton stocks.  The overwhelming majority of cotton is "out-of-position", *i.e.*, outside the ICE warehouse, in non-deliverable locations, of non-deliverable grades; this was true during the Class Period as well.  Limiting effective hedges to deliverable cotton would effectively end the risk-transfer function of the cotton futures market and, ultimately, would end cotton futures trading.

(a) Between 2000 and 2011, inclusive, the lowest projected cotton stocks in the U.S. for February, March, April, May and June of each year, were each registered in 2011 according to the World Agriculture Supply and Demand Estimates Report by the USDA.

(b) Similarly, the amount of ICE certificated cotton stocks from mid-February to June 2011 was lower than it had been during the same months for all the earlier years of ICE cotton trading.

(c) During the Class Period, according to cotton merchants, there were no or virtually no supplies of non-certificated cotton in ICE warehouses that were available for sale and there were almost no supplies of non-certificated cotton that were already in transit for ICE warehouses that could have been certificated in time for delivery and were available for sale.

(d) The precise amount of available deliverable supplies was a function of time and other matters including USDA certification delays. Plaintiffs have good grounds to believe and do allege that the total amount of deliverable supplies on the May 2011 Contract during the Class Period was significantly less than 500,000 bales. Similarly, after Defendants' cancellation of 142,680 bales on June 1-2, 2011, the amount of the deliverable supply on the July 2011 Contract between June 7 and July 7, 2011 was significantly less than 250,000 bales.

(e) Reasons for such low deliverable supplies included the amount of time required to move cotton from non-ICE warehouses into ICE warehouses and thereafter to certificate same to make such cotton "tenderable" (*see* ¶31(a)-(j) *supra*), the large export cancelations from mid-March 2011 forward that produced increasing large amounts of available cotton in the cash markets that could not be timely moved into the ICE warehouse for delivery, (*see* ¶¶5(e), (f), 31(a)-(j), 36(e), 53-63, 74-79); Defendants' uneconomic refusal to re-tender (*see* ¶¶42(c)-(f), 44(b), 52(a)-(u)), Defendants' decertification of ICE warehouse supplies (¶42(c)-(d)), and Defendants' rejections of EFPs for the cotton being offered to Defendants in the actively trading cash markets. *See* ¶¶53-63.

(f) Although the cotton being offered to Defendants (more than 1,000,000 bales in aggregate), could not be moved into the ICE warehouses in time for futures market delivery, such cotton was freely available to satisfy any legitimate needs for cotton that Defendants or any market participant had.

(g) Part of the deliverable supply was owned during March and perhaps, during April 2011 by Defendants themselves and, therefore, should be excluded from the deliverable supply.

(h) On March 9, 2011 Defendants began stopping deliveries on the March 2011 Contract. By March 14, 2011 Defendants stopped 88 March 2011

Contracts (8800 bales) and by March 16, 2011 Defendants stopped a total of 120 March 2011 Contracts (12,000 bales).

(i) Speculators' ability to transact in the futures market is important because, as Defendant Nicosia and others have said and as the law recognizes, speculators provide important benefits. These benefits include taking on price risks, permitting hedgers to transfer price risks, and supplying liquidity.

## C. **Convergence, Issues Of Certificates And Stops Of Certificates**

37. **Absence of Safe Harbors.** CEA manipulation law and the convergence of futures contract prices and cash market prices each supersede the sometimes asserted right of large traders to insist on receiving or making significant amounts of deliveries. Manipulation is a separate violation. Manipulation is not derivative. That is, manipulation does not depend upon whether the alleged manipulator claims to have followed all of the other rules. Nor does it depend on whether the alleged manipulator did in fact follow all of the other rules. Rather, if the participant intends to and does cause artificial prices or artificial price trends, then the participant has manipulated prices. If the participant intended to do and did the foregoing, there are no safe harbors.

38. Although convergence is a hallmark and a primary objective of futures contract trading in the United States, the custom and practice of the commodity exchanges and the CFTC have been not to intervene in trading when

manipulation is suspected (except in emergency situations). Instead, the exchanges and the CFTC have typically allowed the market to "trade out". After the market has traded out, private parties and others (including the CFTC) may allege that violations of the law or rules against manipulation have occurred or that other deleterious acts occurred.

39.     In the foregoing context, on each trading day, the ICE cotton delivery notices market data reports reflect the number of contracts stopped and issued as of such day and cumulatively by clearing members.[3]

40.     The daily ICE cotton futures contract issues and stops relate to the deliveries of cotton against expiring contracts traded on ICE Futures U.S. in New York. The notices reflect the movement of cotton to offset each long or short futures position. Issuers make deliveries, and stoppers take deliveries.

41.     The May 2011 Contract ceased trading on May 6, 2011, and First Notice Day ("FND") was April 25, 2011, and the first delivery date on such contract was May 2, 2011. The FND of the July 2011 Contract was June 24, 2011, the first delivery date of such contract was July 1, 2011, and the last trade date of such contract was July 7, 2011.

**D.  Additional Facts of Defendants' Manipulation**

**1.     Defendants Took Delivery Of Over 99% of The ICE May 2011 Cotton No. 2 Contract**

---

[3] *See* https://www.theice.com/marketdata/reports/ReportCenter.shtml.

42.     Between April 25, 2011 and May 13, 2011, the issuers making

deliveries filed notices in respect of 3,928 May 2011 ICE Cotton No. 2 contracts

and the stoppers taking deliveries filed notices in respect of the same amount of

such contracts.  The breakdown in respect of issues and stops by clearing member

firms and stops are set forth below.  Defendant Term Commodities took delivery

of almost 100% of the May 2011 ICE Cotton No. 2 contract.

a.  **The Issuances by Clearing Member Firms**.  ICE clearing members issued

notices relating to 3,928 May 2011 Contracts as follows:

| Date | Issues By Firm | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 25-Apr | 2-May | 4-May | 5-May | 6-May | 9-May | 10-May | 11-May | 12-May | 13-May |
| ADM Investor Services | 6 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 | 17 |
| Citigroup Global Markets Inc. | 7 | 20 | 0 | 0 | 33 | 0 | 31 | 0 | 0 | 97 |
| JP Morgan | | | | | 203 | 0 | 0 | 0 | 0 | 374 |
| Merrill Lynch Futures Inc. | | 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Morgan Stanley Co., Inc. | | 280 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Newedge USA, LLC | | 1179 | 0 | 185 | 94 | 0 | 0 | 100 | 252 | 963 |
| Penterra Div. of FC Stone, LLC | | | | | | | | | | 1 |
| RJ Obrien | | | | | 1 | 11 | 3 | 0 | 0 | 58 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| and Associates LLC | | | | | | | | | | |
| Term Commodities | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| UBS Securities LLC | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTALS | 13 | 1489 | 1 | 185 | 331 | 11 | 34 | 100 | 254 | 1510 |

b. **The Taking of Deliveries by Defendants**.  Defendants, through Term Commodities, took delivery of 3,898 of 3,928 May 2011 Contracts (99.23% of stops by all clearing member firms) as follows:

| Stops By Firm | | | |
|---|---|---|---|
| Date | Term Commodities | All Other Clearing Members | Totals |
| 25-Apr | 13 | 0 | 13 |
| 2-May | 1481 | 8 | 1489 |
| 4-May | 1 | 0 | 1 |
| 5-May | 184 | 1 | 185 |
| 6-May | 329 | 2 | 331 |
| 9-May | 11 | 0 | 11 |
| 10-May | 34 | 0 | 34 |
| 11-May | 99 | 1 | 100 |
| 12-May | 252 | 2 | 254 |
| 13-May | 1494 | 16 | 1510 |
| Totals | 3898 | 30 | 3928 |

Source:  www.theice.com. The figures reflect the number of ICE contracts involved in deliveries.  Each contract represents 50,000 pounds net weight.

38

c. **Uneconomic Failure to Re-tender; Decertification.**  As the above numbers and those in ¶43 reflect, Defendants did not re-tender or sell back on the ICE any of the certificated cotton of which Defendants took delivery.  Because ICE cotton during April-May 2011 and again in June-July 2011 was the highest price cotton in the world, it was economic for Defendants to re-tender same.   It was uneconomic for Defendants to refuse to re-tender.  Such uneconomic refusal to re-tender depleted deliverable supplies and further inflated prices.

d. **Uneconomic Depletion of Cash Market Supplies Available for Delivery on the May 2011 and July 2011 Contract.** Further depleting the deliverable cash market cotton supply, Defendants decertified **all of** the cotton of which they received delivery on the ICE in the May 2011 Contract.  Defendants' uneconomic refusal to re-tender and extreme decertification of 100% of such cotton further depleted available deliverable cash market supplies on the May 2011 Contract from April 25, 2011 forward, and on the July 2011 Contract, especially from the surprisingly large decertification by Defendants on June 1-2, 2011.

e. Defendants' foregoing uneconomic conduct inflated prices on the May 2011 Contract from April 25 until the end of trading therein, and in the July 2011 Contract from at least June 1, 2011 forward.

f. **Load-Out Orders.**  To the extent that Defendants moved the cotton out of ICE warehouses, this created another evil of manipulation: a dead weight loss of

moving cotton into and out of the warehouses. The deliveries taken by Defendants alone on the May 2011 Contract were **2.02** times the certificated cotton stocks at the start of the notice period. This was 56% greater than the next highest ratio of (i) **all** deliveries made in any prior ICE contract to (ii) the amount of certificated stocks in the ICE warehouse at the start of the notice period.

2.  **Continuing Their Pattern Of Uneconomic Conduct, Defendants Took Delivery Of Over 99% Of The ICE July 2011 Contract**

43. Between June 24, 2011 and July 14, 2011, the issuers making deliveries filed notices in respect of 1,629 July 2011 Contracts and the stoppers taking deliveries filed notices in respect of the same amount of such contracts. The breakdown in respect of issues and stops by clearing member firms and stops are set forth below. Defendant Term Commodities took delivery of almost 100% of the July 2011 ICE Cotton No. 2 contract.

a.  **The Issuances by Clearing Member Firms**. ICE clearing members issued notices relating to 1,629 July 2011 Contracts as follows:

| Date | Issues By Firm | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 24-Jun | 27-Jun | 28-Jun | 29-Jun | 30-Jun | 1-Jul | 5-Jul | 6-Jul | 7-Jul | 8-Jul | 11-Jul | 12-Jul | 13-Jul | 14-Jul |
| ADM Investor Services | 1 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Citigroup Global Markets Inc. | | 10 | 6 | 0 | 0 | 0 | 0 | 10 | 1 | 0 | 5 | 4 | 15 | 153 |
| JP Morgan | 313 | 17 | 0 | 47 | 27 | 41 | 34 | 32 | 31 | 30 | 34 | 31 | 20 | 408 |

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Merrill Lynch Futures Inc. | | | | | | | | | | | | | | |
| Morgan Stanley Co., Inc. | | | | | | | | | | | | | | |
| Newedge USA, LLC | | | | | | | | | | | 29 | 0 | 0 | 0 |
| Penterra Division of FC Stone, LLC | 145 | 0 | 0 | 0 | 0 | 0 | 0 | 98 | 0 | 0 | 38 | 0 | 0 | 44 |
| RJ Obrien and Associates LLC | | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Term Commodities | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| UBS Securities LLC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTALS | 459 | 29 | 7 | 47 | 27 | 41 | 34 | 140 | 32 | 30 | 106 | 35 | 35 | 607 |

b. **The Taking of Deliveries by Defendants**.  Defendants, through Term

Commodities, took delivery of 1,613 of 1629 July 2011 Contracts (99.01% of

stops by all clearing member firms) as follows:

| Stops By Firm | | | |
|---|---|---|---|
| Date | Term Commodities | All Other Clearing Members | Totals |
| 24-Jun | 455 | 4 | 459 |
| 27-Jun | 28 | 1 | 29 |
| 28-Jun | 7 | 0 | 7 |
| 29-Jun | 47 | 0 | 47 |

| | | | |
|---|---|---|---|
| 30-Jun | 27 | 0 | 27 |
| 1-Jul | 41 | 0 | 41 |
| 5-Jul | 34 | 0 | 34 |
| 6-Jul | 139 | 1 | 140 |
| 7-Jul | 32 | 0 | 32 |
| 8-Jul | 30 | 0 | 30 |
| 11-Jul | 105 | 1 | 106 |
| 12-Jul | 35 | 0 | 35 |
| 13-Jul | 35 | 0 | 35 |
| 14-Jul | 598 | 9 | 607 |
| Totals | 1613 | 16 | 1629 |

Source: www.theice.com.  Again, the figures reflect the number of ICE contracts involved in deliveries.  Each contract represents 50,000 pounds net weight.

44.     (a) Almost all of the stopped deliveries for May and July were taken by a single clearing firm, Term Commodities which is owned by other Defendants. Plaintiffs have good grounds to believe and do allege that Term was working for and on behalf of the Defendants.  That is, from April 25, 2011 to May 13, 2011, the Defendants took delivery of 3,898 or 99.23% of May 2011 Contracts, and from June 24, 2011 to July 14, 2011, the Defendants took delivery of 1,613 or 99.01% of May 2011 Contracts.

(b) Defendants' uneconomic conduct in stopping and refusing to re-tender record ratios of deliveries and further depleting the deliverable supplies by de-certificating such cotton are only the most visible culminating tip of the iceberg of many less visible uneconomic steps taken by Defendants which uniformly had

42

the effect of inflating and manipulating prices.  *See* ¶¶44-85 below.  Defendants'
interconnected series of uneconomic steps each consisted of highly unusual steps
that were contrary to the customs and practices of cotton market participants
including cotton merchants.

**3**.     **Defendants' Large Long Positions In May 2011 Contracts And July 2011 Contracts**

45.     Defendants, through Term Commodities, not only were the dominant
stopper of deliveries.  Defendants also held dominant long positions in, first, the
May 2011 Contract and, later, the July 2011 Contract.  See ¶¶137-143 *infra*.
Defendants did so, in part, as part of spread positions.

46.     However, unlike with delivery information, information about a
trader's long positions and other positions in the futures markets are not publicly
posted.  On the contrary, such information is regarded as confidential.  Therefore,
Plaintiffs do not know and cannot learn, absent discovery, the exact dates or exact
amounts of the purchases by Defendants of their large long positions.

47.     Plaintiffs have good grounds to believe and do allege that Defendants
began to acquire significant long positions in the May 2011 Contract by late March
2011, and added to them thereafter as FND approached.  Similarly, Plaintiffs have
good grounds to believe and do allege that Defendants began to acquire significant

long positions in the July 2011 Contract by late May 2011, and added to them thereafter as FND approached.

48.     Plaintiffs' good grounds include the CFTC Commitment of Traders Reports, the ICE open interest reports, and the following facts.

49.     During February 2011, the March 2011 Contract Futures Contract, as it approached the expiration of trading in such contract, gradually ceased to be the most actively traded cotton futures contract and gradually ceased to be the cotton futures contract with the largest open interest.  The May 2011 Contract then became the most actively traded cotton futures contract and the one with the most open interest.

50.     By the end of February or early March 2011, most of the market had liquidated their March 2011 Contract positions or "rolled" out of the March 2011 Contract and into the May 2011 Contract.

51.     To "roll," means that a trader makes the opposite trade of the position held in the expiring month (*e.g.*, a person long one March 2011 Contract would sell one March 2011 Contract), and simultaneously executes a transaction for the same position in the next futures contract (*e.g.*, a long would purchase one May 2011 Contract to create a long position there).  In this example, the trader would sell one March contract and buy one May contract.

52. (a) The "open interest" of futures contracts is reported daily and reflects the amount of contracts that have been open but not yet liquidated or closed. Traders who do not roll generally find ample liquidity to establish new positions during the time of the rolls. Given the foregoing facts, it is most likely that Defendants purchased their long May 2011 Contract positions by late March 2011 and added to them thereafter during April.

(b) Due to a similar but not identical sequence of open interest and trading in the July 2011 Contract, it is most likely that Defendants purchased July 2011 Contracts by late May 2011.

(c) Just as Defendants took 99-plus percent of the deliveries on each of the May and July 2011 Contracts, so Defendants held dominant long positions in those contracts prior to the delivery period and caused highly unusual or unprecedented changes in the rate of the liquidation of the outstanding open interest in the those contracts.

(d) The pattern of liquidation in each of the prior years (2008-2010) of trading in May contracts during the history of ICE (and for the prior five years before ICE, 2003-2007) was very similar. The May 2011 Contract dramatically deviated from this prior history of trading in May Contracts.

(e) Defendants' additions to their long positions and Defendants' continuing refusal to liquidate their May 2011 Contract long positions caused there to be between 30 and 379% more open interest in the May 2011 Contract from the 13th trading day before First Notice Day through First Notice Day than the historical May contract experience.

(f) Worse, from the 25th trading day before First Notice Day forward, the average open interest fell on every succeeding trading day for the prior May contracts during the history of ICE trading.  However, in the May 2011 Contract, the open interest anomalously increased (1) from the 25th to the 24th day, (2) from the 24th to the 23$^{rd\ day}$, (3) from the 23rd to the 22nd day, (4) from the 22nd day to the 21st day, and (5) from the 21st day to the 20th day.  After these five straight increases, the open interest in the May 2011 Contract declined on the 19th day.  But the open interest anomalously increased again (6) from the 18th day to the 17th day, (7) from the 16th day to the 15th day, and (8) from the 12th day to the 11th day before FND.

(g) In other words, the open interest on the May 2011 Contract increased on **eight of the twelve trading days** between the 25th day before FND and the 12th day before FND compared to **zero** such **increases** in the average open interest in May contracts over that period.  Plaintiffs have good grounds to believe and do allege that the reasons for the anomalous increases in the open interest of

the May 2011 Contract included Defendants' highly unusual purchases of additional May 2011 Contract long positions.

(h) Alleged in the **first column** below are the number of trading days before First Notice Day in the May Contract; alleged in the **second column** is the cumulative percentage amount of the total open interest in the May 2011 Contract on the 26th trading day before FND, that was liquidated by each such trading day; alleged in the **third column** below is the cumulative average percentage of open interest on the 26th trading day before FND in each of the prior May contracts during the history of ICE trading, that had been liquidated by such trading day; alleged in the **fourth column** is the actual outstanding open interest in the May 2011 Contract on that trading day in 2011; and alleged in the **fifth column** is the amount the open interest of the May 2011 Contract would have been on that trading day if it had conformed to the average liquidation pattern during the history of ICE May futures contract trading.

| Trading Days until FND | 2011 % Change from Day 26 | Average % Change from Day 26 for Over ICE History of Prior May Contracts | 2011 Open Interest | What 2011 Open Interest Would Have Been Had It Conformed to ICE History of May Contract Average Open Interest |
|---:|---:|---:|---:|---:|
| 26 | | | 70638.0 | |
| 25 | 0.3 | -0.1 | 70406.0 | 70722.0 |

| | | | |
|---:|---:|---:|---:|---:|
| 24 | -1.0 | 1.5 | 71310.0 | 69551.5 |
| 23 | -2.1 | 3.0 | 72109.0 | 68500.2 |
| 22 | -2.3 | 4.1 | 72254.0 | 67721.9 |
| 21 | -2.4 | 5.1 | 72354.0 | 67021.8 |
| 20 | -2.6 | 6.6 | 72442.0 | 65966.4 |
| 19 | -1.7 | 8.2 | 71810.0 | 64880.8 |
| 18 | -2.4 | 11.2 | 72351.0 | 62760.5 |
| 17 | -2.3 | 15.1 | 72287.0 | 59952.6 |
| 16 | -2.8 | 17.5 | 72646.0 | 58276.8 |
| 15 | -1.7 | 20.3 | 71838.0 | 56300.8 |
| 14 | 0.1 | 22.2 | 70540.0 | 54991.1 |
| 13 | 0.4 | 25.8 | 70372.0 | 52407.2 |
| 12 | 0.0 | 33.6 | 70654.0 | 46914.0 |
| 11 | 3.6 | 42.4 | 68115.0 | 40709.3 |
| 10 | 13.4 | 50.7 | 61202.0 | 34853.5 |
| 9 | 18.1 | 58.5 | 57820.0 | 29343.1 |
| 8 | 24.9 | 66.7 | 53072.0 | 23517.6 |
| 7 | 30.6 | 73.2 | 49009.0 | 18930.7 |
| 6 | 35.0 | 79.4 | 45891.0 | 14575.3 |
| 5 | 41.6 | 82.6 | 41286.0 | 12320.7 |
| 4 | 57.2 | 89.3 | 30203.0 | 7566.6 |
| 3 | 69.1 | 92.7 | 21802.0 | 5165.3 |
| 2 | 78.1 | 95.3 | 15503.0 | 3350.2 |
| 1 | 90.7 | 96.5 | 6589.0 | 2456.8 |
| 0 | 91.6 | 98.2 | 5936.0 | 1238.7 |

(i) Based upon the foregoing, in **Column one** below, the number of trading days until FND is again alleged. In the **second column** below, Plaintiffs allege the ratio of the actual open interest in the May 2011 Contract to what that open interest would have been if it had conformed to the liquidation pattern in

48

prior May contracts during the history of ICE trading (again, the results would be similar if at least the first five years prior to ICE trading were added into the average). That is, each line in column two below reflects the number for that trading date in column four above divided by the number for that trading date in column five above. Alleged in **column three** below is the percentage by which the actual May 2011 Contract open interest was greater than what the May 2011 open interest should have been based upon historical experience.

| Days until FND | Ratio of May 2011 Open Interest To What May 2011 Open Interest Would Have Been Had It Conformed to ICE History of the May Contract Average Open Interest (2008-2010) | Percentage by which the actual May 2011 contract open interest was greater than What 2011 Open Interest Would Have Been Had It Conformed to ICE History of the May Contract Average Open Interest (2008-2010) |
|---|---|---|
| 26 | | |
| 25 | 1.0 | -0.4 |
| 24 | 1.0 | 2.5 |
| 23 | 1.1 | 5.3 |
| 22 | 1.1 | 6.7 |
| 21 | 1.1 | 8.0 |
| 20 | 1.1 | 9.8 |
| 19 | 1.1 | 10.7 |
| 18 | 1.2 | 15.3 |
| 17 | 1.2 | 20.6 |
| 16 | 1.2 | 24.7 |
| 15 | 1.3 | 27.6 |

49

| | | |
|---|---|---|
| 14 | 1.3 | 28.3 |
| 13 | 1.3 | 34.3 |
| 12 | 1.5 | 50.6 |
| 11 | 1.7 | 67.3 |
| 10 | 1.8 | 75.6 |
| 9 | 2.0 | 97.0 |
| 8 | 2.3 | 125.7 |
| 7 | 2.6 | 158.9 |
| 6 | 3.1 | 214.9 |
| 5 | 3.4 | 235.1 |
| 4 | 4.0 | 299.2 |
| 3 | 4.2 | 322.1 |
| 2 | 4.6 | 362.8 |
| 1 | 2.7 | 168.2 |
| 0 | 4.8 | 379.2 |

(j) As may be seen from column two, for the last nine days of trading the May 2011 Contract, the actual open interest was at least approximately twice as much, for the last six days was at least approximately at least three times as much, and for the last four-two days was at least approximately four times as much as the amount of contracts that should have been outstanding under a normal historical liquidation pattern for May contracts.

(k) Applying the percentage difference between what the May 2011 Contract should have been under ICE historical experience and the extremely high actual May 2011 Contract open interest that Defendants caused shows that Defendants caused the actual open interest to be almost 35% higher than it should

have been thirteen trading days from FND *i.e.*, on April 5, 2011; almost 68%

higher eleven trading days from FND *i.e.*, April 7, 2011, and between twice as

much and four times greater than it should have been for the remaining trading

days until FND.

(l) These large differences reflect Defendants' uneconomic squeeze of

the shorts when was too late to bring new cotton to the ICE warehouse.

(m) Based on the foregoing and other information, Plaintiffs allege (1)

that Defendants' May 2011 Contract long positions far exceeded the available

deliverable supply of cotton on the May 2011 Contract during the Class Period, (2)

that Defendants liquidated at least 14,000-21,000 May 2011 Contracts long

positions from April 18, 2011 until FND and thereafter, (3) that the 14,000

contracts represented 1.4 million bales which constituted, by itself, approximately

three times the available deliverable supply, and (4) that Defendants additionally

took their record ratio of deliveries amounting to another 380,000 bales (or 3800

contracts) of cotton.

(n) Similarly, the CFTC Commitment of Traders Report reflects an

anomalous increase in the interest held by producers, merchants and users during

late March-early April 2011 followed by an anomalous plunge such holdings.

(o) Absent manipulation, the level of backwardation is determined by the level of prices and the level of the excess of demand over the supply. The lower the level of prices, the lower the backwardation. Between March 25 and April 27, 2011, the price levels declined from above $2.00 to less than $4.80 but the backwardation almost tripled from 7¢ to 21¢. This meant that the backwardation should commensurately go down. In essence, the backwardation fell from 12 cents to 6 cents between March 11 and March 30 consistent with the cancellation of export orders and the deteriorating supply-demand fundamentals for cotton. However, due to Defendants' conduct, the backwardation did a U-turn and began to increase contrary to the fundamentals and the falling price levels:

| Date | May 2011 Contract Closing Price | May 2011 - July 2011 Backwardation |
|---|---|---|
| 3/11/2011 | 204.94 | 11.69 |
| 3/14/2011 | 197.94 | 11.69 |
| 3/15/2011 | 190.94 | 11.69 |
| 3/16/2011 | 185.12 | 9.66 |
| 3/17/2011 | 192.12 | 9.66 |
| 3/18/2011 | 199.12 | 9.66 |
| 3/21/2011 | 198.96 | 9.06 |
| 3/22/2011 | 205.96 | 9.06 |
| 3/23/2011 | 201.87 | 7.94 |
| 3/24/2011 | 208.82 | 8.33 |
| 3/25/2011 | 204.49 | 7.38 |
| 3/28/2011 | 197.49 | 7.38 |

| | | |
|---|---:|---:|
| 3/29/2011 | 194.88 | 7.09 |
| 3/30/2011 | 193.67 | 6.82 |
| 3/31/2011 | 200.23 | 7.33 |
| 4/1/2011 | 195.55 | 7.45 |
| 4/4/2011 | 195.55 | 8.28 |
| 4/5/2011 | 201.06 | 9.67 |
| 4/6/2011 | 208.06 | 12.64 |
| 4/7/2011 | 208.22 | 13.65 |
| 4/8/2011 | 202.97 | 13.07 |
| 4/11/2011 | 204.58 | 13.67 |
| 4/12/2011 | 199.73 | 14.16 |
| 4/13/2011 | 197.35 | 16.71 |
| 4/14/2011 | 196.04 | 18.04 |
| 4/15/2011 | 195.52 | 18.12 |
| 4/18/2011 | 196.45 | 18.29 |
| 4/19/2011 | 189.82 | 18.66 |
| 4/20/2011 | 183.17 | 16.11 |
| 4/21/2011 | 186.67 | 19.16 |
| 4/25/2011 | 188.08 | 21.69 |
| 4/26/2011 | 181.84 | 21.45 |
| 4/27/2011 | 174.89 | 21.5 |
| 4/28/2011 | 172.82 | 20.8 |
| 4/29/2011 | 178.78 | 20.76 |
| 5/2/2011 | 175.91 | 21.46 |
| 5/3/2011 | 179.21 | 21.7 |
| 5/4/2011 | 173.19 | 21.68 |

(p) By adding to their May 2011 Contract long position and refusing to liquidate except at record levels of backwardation, Defendants knowingly created and/or greatly exacerbated the congestion in which the amount of the open

interest in the May 2011 Contract greatly exceeded the amount of cotton that could be timely delivered on the May 2011 Contract. This congestion was intensified by the long times it took during April-May 2011 to move cotton from non-ICE warehouses into ICE warehouses and certificate such cotton during April-May 2011.

(q) Similarly, for the last eight trading days before First Notice Day, Defendants' large long positions in the July 2011 Contract caused the July 2011 open interest to be between 1.2 and 2.9 times more than it should have been based upon ICE trading history.

| Trading Days until FND | Ratio of July 2011 Open Interest To What July 2011 Open Interest Would Have Been Had It Conformed to ICE History of the July Contract Average Open Interest (2008-2010) | Percentage by which the actual July 2011 contract open interest was greater than What 2011 Open Interest Would Have Been Had It Conformed to ICE History of the July Contract Average Open Interest (2008-2010) |
|---|---|---|
| 8 | 1.2 | 12.4 |
| 7 | 1.5 | 46.3 |
| 6 | 1.8 | 82.5 |
| 5 | 2.4 | 140.3 |
| 4 | 2.8 | 179.8 |
| 3 | 2.9 | 194.6 |
| 2 | 2.4 | 138.4 |
| 1 | 2.0 | 97.3 |
| 0 | 2.9 | 190.1 |

(r) Defendants' long positions in the July 2011 Contract well exceeded the available deliverable supply. Defendants' long positions in the May 2011 Contracts and July 2011 Contracts exceeded the position limit at all times between March 30 and May 6 with respect to the May 2011 Contract and all times between June 7 and July 7 with respect to the July 2011 Contract.

(s) Defendants' uneconomic and uncommercial conduct in establishing and refusing to liquidate their large long positions in the May 2011 and July 2011 Contracts coupled with Defendants' other uneconomic conduct (*see* ¶¶61(a)-(i)), violated and failed to satisfy CFTC Reg. 1.3(z)(1)(iv), 17 C.F.R. §1.3(z)(1)(iv).

(t) Defendants knew the futures market was an anticipatory and forward-looking market. Defendants knew that their unusual conduct during March-April 2011 would cause the May 2011 Contract prices to increase, and their unusual conduct during May-June 2011 would cause July 2011 Contract prices to increase. This was in anticipation of the threatened record ratio of deliveries that did in fact occur, and because Class members had to deal with Defendants to buy out of their short positions in, first, the May 2011 Contract and, later, the July 2011 Contract.

(u) Defendants' foregoing manipulation produced great net profits for Defendants from their uneconomic behavior of taking high priced deliveries and turning down lower cash market prices. However, these profits to Defendants from their uneconomic conduct caused great damages to Class members as well as to the markets generally.

**4.     In Order To Stop Such High Amounts Of Deliveries, Defendants Turned Down Lower Priced Cotton Available On The SEAM Cash Market**

53.     With regard to the separation of cotton futures contract prices and cotton cash market prices, cotton in the cash market *was* very freely available during April-July 2011. This was due to cancellations of export orders, declines in near-term demand for cotton, and increases in near-term supplies of cotton.  In fact, cotton was being repeatedly offered in the cash market at **lower prices** than those in the futures market.

54.     For example, during April-May 2011, there were contemporaneous offers of substantial higher quality cotton on the public SEAM market than potentially would have been delivered on cotton futures contracts. In fact, there is a very wide variety of cotton qualities that could be delivered on the cotton futures contract. Therefore, the cotton actually received on a cotton futures contract delivery could be unusable under many export contracts and many domestic

contracts.  Moreover, the cotton on SEAM was offered at a significantly lower price than the May 2011 Contract price.

55.     Indeed, Defendants' threatened insistence on much higher amounts of deliveries than were in (or could be timely added to) the certificated stocks, also caused offers of physical cotton on the public SEAM market (*see* ¶¶57-63 *infra*) and in other cash markets, in the form of exchanges for physical ("EFP").  In these particular EFP's, the physical cotton would be exchanged for May 2011 Contract long positions.

56.     These offers were made at prices that were substantially less than May 2011 Contract prices, and in which the cotton was available more quickly than the potential availability of cotton through ICE.  But Defendants nonetheless uneconomically refused to purchase the lower priced, high quality cotton available on The SEAM and in other cash markets.  Instead, Defendants insisted upon deliveries of the high priced May 2011 Contract which meant uncertain quality at an uncertain date while foregoing artificially high priced sales of the May 2011 Contract in order to satisfy Defendants' May 2011 Contract long positions.  This caused May 2011 Contract prices to further diverge from cash market prices rather than converging with cash market prices as future prices usually do when delivery approaches.

57.     For example, by April 13, 2011, the May/July spread was approximately 16.71¢/lb in backwardation.  An offer of physical cotton inventory was made on The SEAM (www.theseam.com), a public web-based physical cotton trading platform.  The total volume offered was 151,728 bales of cotton or 1,517 futures contracts equivalent.  The offer price was $2.50/bale (or a total of $379,320) cheaper than the equivalent of taking delivery of the ICE or the "board" (taking physical cotton through the futures mechanism).  About 30% of the physical cotton offered was in fact already certified cotton (cotton already certified to be delivered against the ICE cotton futures contract from the First Notice Day).  The balance of the offer was of ICE certifiable quality.

58.     The offer was on the basis of EFP.  Again, an EFP is an Exchange For Physical in which, in this instance, the buyer receives the physical cotton and seller received a long position in the May 2011 Contract.  The load out date for the cotton was guaranteed before June 30.  This was substantially earlier than the latest load out date for May 2011 ICE certificated stocks under the ICE warehouses' 63 day rule. Despite the availability of this cheaper equivalent, Defendants did not purchase this cotton offered on April 13.

59.     **April 15, 2011**.  The May/July spread was approximately 18.12¢/lb in backwardation.  The volume offered on The SEAM was increased to 303,408 bales of cotton or 3,034 futures contracts equivalents.  More than 30% of this offer was

already ICE certificated cotton stock and the balance was ICE certifiable quality cotton. The SEAM-based offer was priced at a discount to (*i.e.*, a "few" percentage points below) taking delivery on ICE. But once again, despite the availability of this cheaper equivalent or preferred cotton, Defendants did not purchase this cotton offered on April 15.

60. **April 19, 2011**. The May/July spread was approximately 18.66¢/lb in backwardation. In addition to the substantial volume of cotton offered on The SEAM, 300,000 bales of cotton or 3,000 futures contracts equivalent of certifiable quality cotton were also offered directly to the trade (including, to Allenberg/LDC, Olam, Cargill and Noble) with The SEAM acting as the broker. The terms and price of such offer were far more economic than taking delivery on ICE. As of this April 19 date, there were now 600,000 bales of cotton offered directly to the market at a price that was $10.00/bale more attractive than "ICE parity" or so called "board parity". This was $6.0 million more attractive than taking delivery on the ICE. Despite the availability of this cheaper and preferred cotton, Defendants did not purchase this cotton offered on April 19.

61. (a) Plaintiffs have good reason to believe and do allege that, through May 2011, repeated offers were made to Defendants of 800,000 bales of physical cotton, 300,000 on The SEAM and 500,000 offered directly. Notwithstanding the substantial price, quality, and other advantages inherent in such offers, Defendants

overwhelmingly refused to accept or otherwise purchase the foregoing offers of cotton.

(b) Customs and practices among cotton market participants (including cotton merchants) include the following: (1) to solicit offers of cotton in the cash market during the month prior to expiration in a futures contract in order to source cotton more cheaply than standing for delivery on a long position, (2) to accept offers, during the month before end of trading in a futures contract, of cotton that provide comparable or better quality cotton at lower prices than standing for delivery on a long position, (3) to source cotton from the cash markets rather than through taking delivery when the cash markets provide lower priced comparable or higher quality cotton than the futures market.

(c) As alleged herein, Defendants violated the foregoing customs and practices repeatedly during the Class Period.

(d) Even if there had been time for cotton market participants to bring cotton from other warehouses into the ICE warehouses for delivery during the Class Period, doing so was contrary to what cotton market participants (including merchants) economically and efficiently should have done.

(e) The "basis" refers to the difference between the futures market price and the cash market price. *See* ¶114. The "basis risk" refers to the risk of

liquidating a futures contract position at a price that is significantly different from the cash market price. Defendants' violations of the customs and practices of cotton market participants intentionally caused record increases of the May 2011 and, later, the July 2011 Contract prices above specified cash market prices. *See infra*. These record deviations caused record basis risks to materialize. They damaged persons who had hedged cash market commitments by shorting the May 2011, and, later, the July 2011 Contract. These persons---including cotton farmers, commercial participants, and others---had to buy out of their futures market short positions at prices far above what they could simultaneously sell their cotton for in the cash market.

(f) Defendants, along with other leading agribusiness companies, started SEAM, which is an online exchange for cash market cotton in December 2000. The SEAM is the most widely used online service provider for commercial sales in the cotton industry. Sellers are provided maximum exposure for sake of their commodities while buyers have real time access to the most complete inventory in the market. The SEAM allows growers to market cotton directly to the merchant and mill community, and merchants and textile mills can to transact with one another over SEAM.

(g) The SEAM guarantees the credit and the transactions. SEAM effectively acts as the clearinghouse. It is the buyer to every seller, and the seller

to every buyer, and guarantees performance. Thus, Defendants would have faced SEAM as its counterparty, if Defendants purchased the SEAM. SEAM also takes extensive measures, as Defendants well know and have stated, to ensure that the quality of cotton delivered meets the terms agreed to by the buyer and seller. Therefore, there is no credit risk to SEAM market transactions (or the same amount of low risk to SEAM transactions as ICE transactions).

(h) As Defendants and SEAM have repeatedly stated, SEAM frequently has hundreds of thousands of bales being offered and buyers are able to source virtually any type of cotton year round.

(i) Because it is a very active cash market and counter parties are guaranteed by the SEAM itself, the SEAM is recognized by the CCC as the means for making and resolving cotton transactions when there are difficulties or failures to deliver by farmers. For example, the CCC uses the SEAM to market cotton obtained when farmers default on CCC loans. Further indicating the reliability of SEAM, the CCC also uses it to market its cotton directly to merchants and mills. Formerly, CCC cotton inventories were sold through the government-based The Cotton Online Processing System.

62. Similarly, during June 7 – July 7, 2011, prices in the cash market were even more dramatically lower than the July 2011 Contract prices. However, less

physical cotton was offered on The SEAM during the lead up to First Notice Day on the July 2011 Contract than for the May 2011 Contract. This was because of the failure to obtain any significant transactions or positive results from the offers of physical cotton on the May 2011 Contract, as alleged in ¶¶52-57 above.

63.     If Defendants were acting economically, they would have purchased the lower priced cotton in the cash market and sold their higher priced futures contracts on the ICE. Instead, Defendants acted uneconomically and intentionally manipulated and artificially inflated first, May 2011 Contract prices and, later, July 2011 Contract prices.

> **5.     The Non-Convergence of Futures and Cash Market Prices; The Much Lower Priced Cotton Available In The Cash Markets**

64.     In addition to distorted spreads between futures contracts, another, lesser indication of manipulation is distorted spreads between cash market prices and futures prices. However, cash markets frequently will price directly off of the futures price. For this and other reasons, some cash market prices sometimes do not provide an independent benchmark with which to measure or evaluate the futures market price.

65.     **Record Divergence Instead of Expected Convergence**. During the Class Period, the May 2011 Contract and the July 2011 Contract prices each diverged significantly cash market prices other than the previously-alleged SEAM prices. These include the following two series of cash market cotton prices: (a)

USDA 1 1/6 inch SLM cotton deliverable in Memphis, Tennessee and (b) USDA 1 inch SLM cotton deliverable in Memphis, Tennessee.  See below.

66.     **USDA Cash Market Cotton 1 1/16 Inch SLM Deliverable In Memphis**.  (a)  **May 2011 Cotton Futures Contract**.  For the time period of April 1 – May 6 for the twelve years of 2000 through 2011, the **top twelve** highest spreads between the May cotton futures contract price and the cash market cotton price were **all** in the May 2011 Contract.  The largest spread during this time period was 20.80 cents on April 28, 2011.  This spread was **almost three times** the highest spread between 2000 and 2010, inclusive.  It was **more than five times** the average spread price during such 2000-2010 period.  The unprecedented spread between the prices of the May 2011 Contract and cash market cotton price in April and May, 2011 is a classic badge of manipulation.

(b)     **July 2011 Cotton Futures Contract**.  For the time period of June 1 – July 6 for the twelve years of 2000 through 2011, the **top thirteen** highest spreads between the July cotton futures contract and the cash market cotton price were **all** in the July 2011 Contract.  The largest spread during this time period was 32.05 cents on June 23, 2011.  This spread was **almost five times** more than the highest spread between 2000 and 2010 inclusive.  It was **more than ten times** the average spread price during the same time period.  The unprecedented spread between the

prices of the July 2011 Contract price and the cash market cotton price in June and July, 2011 is a classic badge of manipulation.

67. **USDA Cash Market Cotton 1 Inch SLM Deliverable In Memphis.**

(a) **May 2011 Cotton Futures Contract**. For the time period of April 1 – May 6 for the twelve years of 2000 through 2011, the **top fourteen** highest spreads between the May cotton futures contract and the cash market cotton price were **all** in the May 2011 cotton futures contract. The largest spread during this time period was 19.63 cents on May 3, 2011. This spread was **more than two times** the highest spread in all the years prior to 2011 back to 2000. It was **more than four times** the average spread price during the same time period. The unprecedented spread between the prices of the May 2011 Contract and cash market cotton price in April and May, 2011 is a classic badge of manipulation.

(b) **July 2011 Cotton Futures Contract**. For the time period of June 1 – July 6 for the twelve years of 2000 through 2011, the **top thirteen** highest spreads between the July cotton futures contract and the cash market cotton price were **all** in the July 2011 cotton futures contract. The largest spread during this time period was 32.34 cents on June 23, 2011. This spread was **more than four times** the highest spread in all the years prior to 2011 back to 2000. It was **more than eight times** the average spread price during the same time period. The unprecedented

spread between the prices of the July 2011 Contract price and the cash market cotton price in June and July, 2011 is a classic badge of manipulation.

68.     Next, Defendants also caused record distortions between the May 2011 Contract price and an index of cash market prices in export markets.

69.     Moreover, Plaintiffs allege below a chart showing the "A-Index" price (an average of the five cheapest offers of various origins, including United States cotton on a CNF Far East basis[4]) compared to May 2011 Contract prices.



70.     As the chart indicates the Cotlook and futures prices usually move closely in tandem.  However, during 2011, the relationship between the A-Index price and the May 2011 Contract price completely separated and disconnected leading up to the May 2011 Contract First Notice Day.

---

[4] CNF is when the seller pays for all freight charges to destination port, after that the buyer pays all costs for clearance customs duties and transport.

71.     These distorted price relationships as well as the quality and availability differentials and the capacity constraints alleged herein, further made it very economic for Defendants to do the following.  They should have sold their high-priced May 2011 Contracts and, later, their high priced July 2011 Contracts, and purchased cotton at the lower prices in the cash markets.

**6.     Divergence From Fundamentals Of Supply And Demand**

**a. Old Crop**

72.     Futures prices and cash market prices influence one another. Therefore, the foregoing dramatic deviations between May 2011 Contract prices and cash market prices, or July 2011 Contract prices and cash market prices, understate the artificiality of the futures prices.

73.     Demand is directly related to price.  That is, as demand decreases, prices tend to fall (all other things equal).  Supply is inversely related to price. That is, as supply increases, prices tend to fall (all else equal).

74.     During March-July 2011, there were large numbers of cancellations of cotton sales orders occurring in the United States.  Not only was the overall number of cancellations high.  There were also a very high amount of **net** cancellations and net cancellations of exports.[5] And there was an extreme

---

[5] Plaintiffs' "net cancellations of exports" data was obtained from the USDA Export Sales Query System.  Net cancellation of exports refers to what the USDA calls "net sales."  The USDA defines "net sales" as: "[t]he sum total resulting from new export sales, increases resulting from

constancy of the net cancellations of exports: in 15 out of 16 weeks, there were net cancellations. This showed that demand for cotton was plummeting.

75. **<u>Net Cancellations Of Exports</u>**. From March until August 2011 and continuing thereafter, the USDA reported net cancellations of exports of United States cotton. See fn. 5. The net cancellation of export orders unexpectedly freed up cotton in the cash market.

76. From March 18 through March 31, 2011 there were 49,170 running bales of net cancellations; April 2011 had 185,235 running bales of net cancellations; May 2011 had 110,727 running bales of net cancellations; June 2011 had 342,054 running bales of net cancellations; July 2011 had 153,864 running bales of net cancellations. *See* USDA's Foreign Agricultural service Export Sales Reporting, http://www.fas.usda.gov/esrquery/.

77. Between March and April 17, 2011, cancellations exceeded old-crop sales in four out of five weeks. *See* http://lubbockonline.com/editorialseditorial-columnists/2011-04-17/howell-export-sales-cancellations-contribute-cotton#.T7UKk8WrHdI. By July 17, 2011, new sales had been exceeded by cancellations in 15 of the last 16

---

changes in destination, decreases resulting from changes in destination, decreases resulting from purchases from foreign sellers, and cancellations resulting from contract adjustments, buybacks, loading tolerances, changes in marketing year, or change in commodity."

weeks. http://lubbockonline.com/agriculture/2011-07-17/howell-global-demand-issues-hammer-cotton-export-outlook-dims#.T7UOmMWrHdI.

78.     (a) On July 17, 2011, there were unprecedented United States old-crop export sales cancellations. *Id.*

(b) Defendants did make during the First Quarter of 2011 (i) export contracts that were cancellable at Defendants' option, and (ii) export contracts in which Defendants had an option as to the exact time of shipment. Any such ICA contracts by Defendants would typically never have required ICE certificated cotton. If any such contracts specified ICE certificated cotton, they would have been contrary to customs and practices of ICA contracts and would only have made sense as a rationale to justify taking large deliveries on ICE futures contracts. *Id.*

(c) Consistent with such non-commercial behavior, there was an extraordinary amount of cancellations reported on July 17, 2011. If Defendants tried to justify taking large deliveries on the May 2011 Contract and/or July 2011 Contract in order to satisfy an export sale and if that sale was both cancelable at a Defendant's option and in fact cancelled, then this would tend to add to the inference of manipulation.

(d) Even if Defendants knew they could use and intended to use some or all of the cotton received on delivery of the May 2011 Contract or July 2011

69

Contract to fulfill supposed fixed time cotton export contracts that had to be shipped at those times, Defendants acted uneconomically for the reasons alleged herein. That is, the Defendants used the most expensive cotton, rather than the most economical cotton, to meet their supposed contract obligations. This profoundly uneconomic, uncommercial conduct is contrary to that of a cotton merchant and can be explained only as part of a considered strategy to manipulate the May 2011 and July 2011 Contracts.

79. The record US export cancellations confirm that the United States domestic market in general and specifically ICE Cotton No. 2 May 2011 and later July 2011 futures contracts were the most attractive sale price and destination for US cotton worldwide. That is, ICE No. 2 was offering the best price to "sell" US cotton to, and the worst price to "buy" US cotton from. But to the extent of the deliveries they stopped, Defendants uneconomically refused to sell their long positions at these best selling prices, and instead overpaid to purchase cotton at these worst buying prices for cotton.

80. USDA statistics show that the amount of the actual cotton available at August 1, 2011 compared to the amount that had been projected by the USDA in March 2011 to be available on August 1, 2011, constituted the highest March 1 – August 1 increase since at least 1990.

81.     The foregoing large **decrease** in actual and near-term **demand** for cotton and large **increase** in the actual and near-term **supply** of cotton meant that prices of cotton for immediate and near-term delivery should fall relative to prices for delivery further into the future.

82.     In fact, the projected amount of cotton in the carryout from the 2010 crop was increasing steadily between April and July.  This and the other facts alleged herein should have caused the prices of old crop cotton to **DECREASE** relative to the prices of new crop cotton.

### b. New Crop

83.     Meanwhile, the USDA projected crop size for the new, 2011 crop **declined** by 11% between April and July 2011.  This meant that, all other things equal, prices for new crop cotton (*i.e.*, from August 1, 2011) forward should **INCREASE** relative to the price of old crop cotton (*i.e.*, cotton delivered before August 1, 2011).

84.     Thus, the fundamentals for the old crop (¶¶72-82) and the fundamentals for the new crop (¶83) both indicated that the prices of the expiring futures contract (first, the May 2011 Contract and, later, the July 2011 Contract) price should become much *lower* relative to the prices of later expiring futures contracts.

### c.   Spreads Moved In The Opposite Direction Of That Indicated By The Fundamentals

85.     However, Defendants' uneconomic conduct (including their insistence upon record ratios of deliveries relative to certificated stocks) caused price relationships to move in the **opposite** direction.

86.     Controlling for USDA forecast carryout, the May-July backwardation in May 2011 and the July-December backwardation in July 2011 were extreme and unprecedented as compared to the 1990/91 -- 2009/10 crop years.

87.     In May 2011, the May-July spread was approximately 20 cents higher than would be expected given (a) the relation between the May-July spread and USDA projections of carryout during the 1990-2010 period, and (b) the USDA projected carryout as of May 2011.  The t-statistic here is 30, which is very highly statistically significant.  The probability that this would be observed by chance in a competitive market is infinitesimal and involves many more zeroes than are listed in the probability alleged below for the July 2011 Contract.

88.     In early-July 2011, the July-December 2011 spread was approximately 34 cents higher than would be expected given (a) the relation between the July-December spread and USDA projections of carryout during the 1990-2010 period, and (b) the USDA projected carryout as of early-July, 2011.  The t-statistic on this difference is highly statistically significant.  The t-statistic is 12.75, which would almost never be observed by chance in a competitive market (the probability is on the order of .0000000000001).

89.     In a competitive market, increasing backwardation should be associated with stock drawdowns.  This is because, as the present cotton becomes much more valuable or higher priced than cotton in two to three months, the rational economic actors hurry to sell their cotton at the relatively high prices now available.  Such sales are preferable to continuing to pay storage, insurance and other charges to hold the cotton in warehouses **for months until the lower prices** are projected to materialize.

90.     During the delivery period on the May 2011 Contract, deliverable cotton stocks were rising while the backwardation was increasing.  This is not expected in a competitive market.  Rising backwardations should be associated with deliverable cotton stock drawdowns.  This also indicates a manipulated market.

91.     The price and deliverable cotton stock movements were highly anomalous, a badge of manipulation, and not consistent with normal competitive market behavior.

**6.      Comparison Of Average Spreads In 2011 To Average Spreads In 2010**

**a.      May Contract**

92.     The USDA reported (using the USDA's December 2011 World Agricultural Supply and Demand Estimates report) U.S. carry out stocks at 2.95 million bales as at July 31, 2010.  In comparison, the US carry out stocks as at July

31st 2011 were 2.60 million bales, only slightly less than the prior year. Over the 1990-2010 period, differences in carryout of .35 million bales across years are associated with far smaller differences in spreads across these years, including years with low levels of carryout, than the differences alleged below.

93.     The May 2011 Contract price during the last trading days prior to the First Notice Day[6] of such contract, was greater than the price of the July 2011 Contract on the corresponding dates.

| Days To FND | Trade Date | May 2011 Contract - Closing Price | July 2011 Contract - Closing Price | Differential |
|---|---|---|---|---|
| 11 | 4/8/2011 | 202.97 | 189.9 | (13.07) |
| 10 | 4/11/2011 | 204.58 | 190.91 | (13.67) |
| 9 | 4/12/2011 | 199.73 | 185.57 | (14.16) |
| 8 | 4/13/2011 | 197.35 | 180.64 | (16.71) |
| 7 | 4/14/2011 | 196.04 | 178 | (18.04) |
| 6 | 4/15/2011 | 195.52 | 177.4 | (18.12) |
| 5 | 4/18/2011 | 196.45 | 178.16 | (18.29) |
| 4 | 4/19/2011 | 189.82 | 171.16 | (18.66) |
| 3 | 4/20/2011 | 183.17 | 167.06 | (16.11) |
| 2 | 4/21/2011 | 186.67 | 167.51 | (19.16) |
| 1 | 4/25/2011 | 188.08 | 166.39 | (21.69) |

94.     Thus, the average difference, which was a backwardation, as reflected in column 4 above, was (17.06) cents per pound.

_____

[6] Data obtained by Plaintiffs from ICE does not reflect closing prices for these contracts on April 22, 2011.

95.    The May 2010 Contract price for each of the last eleven trading days prior to the First Notice Day of such contract, was less than the price of the July 2010 Contract.

| Days To FND | Trade Date | May 2010 Contract - Closing Price | July 2010 Contract - Closing Price | Differential |
|---|---|---|---|---|
| 11 | 4/12/2010 | 78.13 | 79.63 | 1.50 |
| 10 | 4/13/2010 | 80.03 | 81.61 | 1.58 |
| 9 | 4/14/2010 | 79.5 | 81.09 | 1.59 |
| 8 | 4/15/2010 | 80.5 | 82.12 | 1.62 |
| 7 | 4/16/2010 | 80.01 | 81.59 | 1.58 |
| 6 | 4/19/2010 | 79.85 | 81.6 | 1.75 |
| 5 | 4/20/2010 | 82.85 | 84.6 | 1.75 |
| 4 | 4/21/2010 | 83.04 | 85.15 | 2.11 |
| 3 | 4/22/2010 | 82.42 | 84.82 | 2.40 |
| 2 | 4/23/2010 | 84.26 | 86.2 | 1.94 |
| 1 | 4/26/2010 | 84.02 | 85.89 | 1.87 |

96.    Thus, the average difference, which was a carrying charge, was 1.79 cents per pound.  Accordingly, although the ending stocks were comparable in 2010 and 2011, the May 2010 Contract actually showed a carrying charge but 2011 dramatically switched to a record backwardation.  This was due to Defendants' unlawful manipulation and artificial inflation of May 2011 Contract prices.

**b. <u>July – December Spread</u>**

97.     The July 2011 Contract price for each of the last eleven trading days prior to the First Notice Day of such contract, was greater than the price of the December 2011 Contract on the corresponding dates.

| Days Prior To FND | Trade Date | July 2011 Contract - Closing Price | December 2011 Contract - Closing Price | Differential |
|---|---|---|---|---|
| 11 | 6/10/2011 | 150.03 | 133.65 | (16.38) |
| 10 | 6/13/2011 | 150.95 | 131.58 | (19.37) |
| 9 | 6/14/2011 | 155.54 | 131.78 | (23.76) |
| 8 | 6/15/2011 | 151.96 | 125.8 | (26.16) |
| 7 | 6/16/2011 | 145.96 | 120.18 | (25.78) |
| 6 | 6/17/2011 | 145.18 | 123.77 | (21.41) |
| 5 | 6/20/2011 | 148.73 | 124.07 | (24.66) |
| 4 | 6/21/2011 | 154.73 | 124 | (30.73) |
| 3 | 6/22/2011 | 161.22 | 121.45 | (39.77) |
| 2 | 6/23/2011 | 164.55 | 119.4 | (45.15) |
| 1 | 6/24/2011 | 165.22 | 121.92 | (43.30) |

98.     Thus, the average difference, which was a backwardation, as reflected in column 4 above, was (28.77) cents per pound.

99.     The July 2010 Contract price for each of the last eleven trading days prior to the First Notice Day of such contract, was greater than the price of the December 2010 Contract on the corresponding dates.

| Days To FND | Trade Date | July 2010 Contract - Closing Price | December 2010 Contract - Closing Price | Differential |
|---|---|---|---|---|
| 11 | 6/10/2010 | 82.51 | 79.07 | (3.44) |
| 10 | 6/11/2010 | 81.54 | 78.94 | (2.60) |
| 9 | 6/14/2010 | 82.56 | 79.47 | (3.09) |
| 8 | 6/15/2010 | 81.97 | 79.62 | (2.35) |
| 7 | 6/16/2010 | 81.77 | 79.7 | (2.07) |
| 6 | 6/17/2010 | 80.8 | 79.42 | (1.38) |
| 5 | 6/18/2010 | 81.78 | 78.95 | (2.83) |
| 4 | 6/21/2010 | 82.15 | 79.17 | (2.98) |
| 3 | 6/22/2010 | 82.46 | 79.21 | (3.25) |
| 2 | 6/23/2010 | 84.45 | 78.16 | (6.29) |
| 1 | 6/24/2010 | 84.48 | 78.72 | (5.76) |

100.    Thus, the average difference, which was a backwardation, as reflected in column 4 above, was (3.28) cents per pound.  Although the end of year supplies were comparable, the backwardation in 2011 was almost nine times greater than that in 2010.  This was due to Defendants' unlawful manipulation and artificial inflation of the July 2011 contract prices.

### c.  <u>July – October Spread</u>

101.    The July 2011 Contract price for each of the last eleven trading days prior to the First Notice Day of such contract, was greater than the price of the October 2011 Contract on the corresponding dates.

| Days Prior to FND | Trade Date | July 2011 Contract - Closing Price | October 2011 Contract - Closing Price | Differential |
|---|---|---|---|---|
| 11 | 6/10/2011 | 150.03 | 139.67 | (10.36) |
| 10 | 6/13/2011 | 150.95 | 139.58 | (11.37) |
| 9 | 6/14/2011 | 155.54 | 138.54 | (17.00) |
| 8 | 6/15/2011 | 151.96 | 133.45 | (18.51) |
| 7 | 6/16/2011 | 145.96 | 127.46 | (18.50) |
| 6 | 6/17/2011 | 145.18 | 129.61 | (15.57) |
| 5 | 6/20/2011 | 148.73 | 129.29 | (19.44) |
| 4 | 6/21/2011 | 154.73 | 130.33 | (24.40) |
| 3 | 6/22/2011 | 161.22 | 128.22 | (33.00) |
| 2 | 6/23/2011 | 164.55 | 125 | (39.55) |
| 1 | 6/24/2011 | 165.22 | 126.92 | (38.30) |

102. Thus, the average difference, which was a backwardation, as reflected in column 4 above, was (22.36) cents per pound.

103. The July 2010 Contract price for each of the last eleven trading days prior to the First Notice Day of such contract, was greater than the price of the October 2010 Contract on the corresponding dates.

| Days Prior to FND | Trade Date | July 2010 Contract - Closing Price | October 2010 Contract - Closing Price | Differential |
|---|---|---|---|---|
| 11 | 6/10/2010 | 82.51 | 78.64 | (3.87) |

| | | | | |
|---|---|---|---|---|
| 10 | 6/11/2010 | 81.54 | 78.53 | (3.01) |
| 9 | 6/14/2010 | 82.56 | 79.15 | (3.41) |
| 8 | 6/15/2010 | 81.97 | 79.32 | (2.65) |
| 7 | 6/16/2010 | 81.77 | 79.28 | (2.49) |
| 6 | 6/17/2010 | 80.8 | 79.16 | (1.64) |
| 5 | 6/18/2010 | 81.78 | 78.56 | (3.22) |
| 4 | 6/21/2010 | 82.15 | 78.91 | (3.24) |
| 3 | 6/22/2010 | 82.46 | 79.39 | (3.07) |
| 2 | 6/23/2010 | 84.45 | 79.56 | (4.89) |
| 1 | 6/24/2010 | 84.48 | 80.01 | (4.47) |

104.    Thus, the average difference, which was a backwardation, as reflected in column 4 above, was (3.27) cents per pound.

105.    In other words, the backwardation in 2011 was seven times greater than that in 2010.  This notwithstanding comparable amounts of carry-out supplies of old crop cotton in 2010 and 2011, and declining near-term demand during 2011.

**E. Defendants' Monopoly Power**

106.    The relevant product market is the long position in the expiring ICE cotton futures contract or the market for taking deliveries on such Contract.  From March 30 until the end of May 2011, this was for the May 2011 Contract.

107.    From June 7 until the end of July 2011, this was for the July 2011 Contract.

108.    Defendants attempted and conspired to monopolize and did monopolize the relevant market.  During May and July 2011, Defendants acquired 99 plus percent of same.

109.    Defendants did so through restrictive and anticompetitive means. These include uneconomically overpaying for cotton and forcing deliveries to happen on the May 2011 Contract and July 2011 Contract that could have been satisfied much more cheaply in the cash market.

110.    Through such violation, Defendants uneconomically and restrictively obtained and exercised control over prices, first, of the May 2011 Contract and, later, of the July 2011 Contract.

111.    Defendants' price control over the May 2011 Contract and the July 2011 Contract reflects monopoly power and collusion.

## F. Cotton On Call Contracts

112.    A Cotton On-Call Contract is a contract in which all the specifications are set except for the final fixed price of the cotton.  The price is based on premiums or discounts ("on" or "off") in a specified month of the ICE Cotton No. 2 futures contract.

113.    The base price of the cotton will remain unfixed until the buyer instructs the seller to buy (fix) futures in order to establish the final contract price

by adding the ICE futures fixation level to the contract "on call", "on" or "off" basis.

114.    "Basis" is the difference between the cash price and the futures price, for the time, place and quality where delivery actually occurs.

115.    "Call cotton" refers to physical cotton bought or sold, or contracted for purchase or sale at a price to be fixed later based upon a specified delivery month future's price.

116.    The CFTC publishes a weekly report entitled the "Cotton On-Call Report" which shows the quantity of call cotton bought or sold on which the price has not been fixed, together with the respective futures on which the purchase or sale is based.

117.    By inflating prices, first, of May 2011 Contracts and, later, of July 2011 Contracts, Defendants damaged persons who had bought cotton on call and were forced to fix their such contracts at artificially high prices relative to the other prices alleged herein.

118.    Specifically, persons who purchased cotton on call contracts based on the May 2011 Contract, and set the price between March 30 – May 6, 2011 paid artificially high prices.  Persons who purchased cotton on call contracts based on the July 2011 Contract, and set the price between June 7 – July 7, 2011 also paid artificially high prices.

### G. Motive

119.   Plaintiffs disclaim any burden to plead the motive of Defendants in manipulating prices.  But Plaintiffs have good grounds to believe and do allege as follows.  In manipulating a public market, it is better to work in concert with associates.  *Strobl v. New York Mercantile Exchange*, 582 F.Supp. 770, 775 (S.D.N.Y. 1984), *aff'd* 768 F.2d 22 (2d Cir. 1985).  The record backwardation and dislocations that Defendants relentlessly caused, during March 30 – May 6, 2011 and June 7 – July 7, 2011 enabled Defendants to gain financially from, first, the artificially high May 2011 Contract prices and, later, the artificially high July 2011 Contract prices compared to Defendants' financial return if normal price relationships had prevailed.

## IV.   EFFECTS ON INTERSTATE COMMERCE AND INJURY TO <u>PLAINTIFFS AND CLASS MEMBERS</u>

120.   ICE futures prices are publically reported in interstate commerce throughout the United States and the world. They affect shipments of cotton in interstate commerce.

121.   During the Class Period, purchasers in interstate commerce of, first, May 2011 Contracts or the cotton-on-call contracts based thereon, and, later, July 2011 Contract or the cotton-on-call contracts based thereon, paid the artificially high prices caused by Defendants.

122. The unlawful agreements and acts alleged herein have had the foregoing and additional substantial additional anticompetitive effect on interstate commerce within the United States.

123. The monopoly, unlawful agreements and other anticompetitive conduct restrained commerce, inflated May 2011 Contract prices relative to other prices, inflated July 2011 Contract prices relative to other prices, and otherwise burdened commerce.

## V.   CLASS ALLEGATIONS

124. Plaintiffs bring this action on behalf of themselves, and all others similarly situated, pursuant to Rules 23(a), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class:

> All persons, corporations and other legal entities that (a) purchased between March 30 and May 6, 2011 a May 2011 Contract in order to liquidate a short position in such contract, including short positions held as part of spread positions; or (b) contracted to purchase cotton on call based on the May 2011 Contract price, and set the price on this contract between March 30 and May 6; or (c) purchased between June 7 and July 7, 2011, a July 2011 Contract in order to liquidate a short position therein, including short positions held as part of spread positions; or (d) contracted to purchase cotton on call based on the July 2011 Contract price, and set the price on this contract between June 7 and July 7, 2011.
>
> Excluded from the Class are Defendants, any parent, subsidiary, affiliate, agent or employee of any Defendant, and any co-conspirator.[7]

---

[7] Plaintiff reserves the right to amend the definition of the Class in the class motion or otherwise.

125.    The Class is so numerous that joinder of all members is impracticable. Due to the nature of the commerce involved, the members of the Class are geographically dispersed throughout the United States.  The number and identity of Class members is unknown to Plaintiffs, but can be readily ascertained.  Plaintiffs believe that there are hundreds of members of the Class.

126.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.    Whether Defendants manipulated the prices of ICE cotton futures contracts in violation of the CEA;

b.    Whether Defendants aided and abetted manipulation in violation of the CEA;

c.    Whether such manipulation caused prices of ICE cotton futures contracts to be artificial;

d.    Whether injury or the extent of such artificiality may be established by common, Class-wide means, including, for example, by regression analysis, econometric formula, or other economic tests;

e.    Whether Defendants monopolized, attempted to monopolize or conspired to monopolize the relevant market;

f.  Whether Defendants combined, conspired and agreed to fix the prices of the May 2011 Contract or the July 2011 Contract;

g.  Whether such violations inflated the prices of such contracts;

h.  Whether such violation inflated the price of cotton on call contracts relative to other prices;

i.  Whether such inflation caused antitrust injury to the property of Plaintiffs and Class members; and

j.  Whether damages, restitution, equitable, compulsory, or other relief is warranted.

127.  Plaintiffs' claims are typical of the claims of the other members of the Class he seeks to represent.  Plaintiffs and members of the Class all sustained damages arising out of Defendants' same course of unlawful conduct alleged herein.

128.  Plaintiffs will fully and adequately protect the interests of all members of the Class.  Plaintiffs have retained counsel experienced in complex commodity futures manipulation and antitrust class actions.  Plaintiffs have no interests which are adverse to or in conflict with other members of the Class.

129.  The questions of law and fact common to the members of the Class predominate over any questions which may affect only individual members.

130.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all class members is impracticable.  The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts, and would also create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class.  A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision with respect to persons similarly situated.  It would do so without sacrificing procedural fairness or bringing about other undesirable results.

131.   The interest of members of the Class in individually controlling the prosecution of separate actions is theoretical rather than practical. The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable.  Plaintiffs anticipate no difficulty in the management of this action as a class action.

## VI.   DEFENDANTS' ANTITRUST VIOLATIONS

132.   Beginning on approximately March 30, 2011, and continuing until at least May 6, 2011, and again beginning on approximately June 7, 2011 and continuing until at least July 7, 2011, the exact dates being unknown to Plaintiffs, Defendants and their unknown co-conspirators engaged in a continuing agreement, understanding, or conspiracy in restraint of trade to artificially fix, maintain,

suppress, and/or stabilize the prices of, first, the May 2011 Contract and, later, the July 2011 Contract.

133. Also, Defendants attempted and conspired to monopolize, and did monopolize, almost 100% of the relevant market.

134. In formulating and effectuating the contract, combination, or conspiracy, Defendants and their co-conspirators engaged in anticompetitive, restrictive and exclusionary activities, the purpose and effect of which were to restrain trade in, fix or manipulate prices ICE cotton futures and options contracts. These activities included the following:

a. Defendants took deliveries on (i) 3,898 of 3,928 May 2001 Contracts (99.23% of stops by all clearing member firms), and (ii) 1,613 of 1,629 July 2011 Contracts (99.01% of stops by all clearing member firms).

b. Defendants acted uneconomically by taking delivery on May 2011 ICE Cotton No. 2 contracts while rejecting offers at lower prices for substantial amounts of equivalent physical cotton prior to the First Notice Day of such contract;

c. Defendants acted uneconomically by taking delivery on July 2011 ICE Cotton No. 2 contracts because substantial amounts of equivalent

physical cotton were available in the cash market prior to the First

Notice Day of such contract;

d. Defendants otherwise knowingly and collusively acted in order to

restrain trade with or through its co-conspirators.

## VII. ALLEGATIONS OF ANTITRUST INJURY TO PLAINTIFFS AND THE CLASS

135. The Defendants' restraint of trade and anticompetitive conduct had

severe adverse consequences on competition and price discovery. Plaintiffs and

other members of the Class were deprived of normal, competitive trading patterns.

Instead, they were subjected to artificially determined prices and price trends as a

direct, foreseeable and intended result of Defendants' unlawful and manipulative

conduct. As a consequence thereof, Plaintiffs and the Class suffered financial

losses and were, therefore, injured in their business or property.

## AS AND FOR A FIRST CLAIM AGAINST DEFENDANTS FOR MANIPULATION IN VIOLATION OF THE COMMODITY EXCHANGE ACT, 7 U.S.C. § 1

136. Plaintiffs repeat and re-allege the previous allegations as if fully set

forth herein.

137. (a) Each Defendant acted in whole or in part through Defendant Term

Commodities, Inc. and/or by virtue of each Defendant's ownership of, control

over, directions to, or conduct in concert with Defendant Term Commodities, Inc.

Defendants intentionally manipulated and artificially inflated May 2011 Contract prices and July 2011 Contract prices.

(b) In the same manner, Defendants also intentionally exacerbated and abused the pre-existing conditions of (1) the relatively low supplies of cotton certificated for delivery on ICE, and (2) the considerable capacity constraints arising from the amount of time that was  required to certificate new cotton for delivery on ICE.  This intentional exacerbation and abuse further manipulated, artificially inflated and exacerbated the manipulation of May 2011 Contract prices and July 2011 Contract prices.

138.   According to "Cotton traders probed on squeeze" a Financial Times article by Gregory Meyer and Javier Blas (http://www.ft.com/cms/s/0/e2b9f84c-a4eb-11e1-b421-00144feabdc0.html#axzz1zCt643I0):

(a) "Louis Dreyfus Commodities", through its Allenberg subsidiary, was a dominant buyer of ICE cotton futures contracts and dominant stopper of deliveries in the May 2011 Contract and the July 2011 Contract.

(b) Louis Dreyfus Commodities and Allenberg each acted, in whole or in very substantial part, through Defendant Term Commodities Inc.

(c) The CFTC Division of Enforcement is investigating whether the May 2011 Contract or the July 2011 Contract prices were manipulated.  This includes by means of a large amount of deliveries.  The CFTC Division

of Enforcement is reportedly also investigating whether cotton was available to Louis Dreyfus Commodities and/or Allenberg in the cash markets at lower prices than the prices of the future contracts.

139.    As previously alleged, cotton **was** available in the cash markets at substantially lower prices than the prices, respectively, of the May 2011 Contract and July 2011 Contract.  See ¶¶53-71.  Moreover, large volume offers of cotton were made on the SEAM market in which Defendants, through Defendants Allenberg and Nicosia, were leading participants. See ¶¶53-62.

140.    **<u>Role of Each Defendant</u>**.  Plaintiffs have good grounds to believe and do allege as follows.  First, Defendant Nicosia controlled and made the decision for Allenberg to acquire large long positions and stop large amounts of deliveries to satisfy such long positions in the May 2011 Contract and the July 2011 Contract.

141.    Second, Defendant Allenberg purchased its large long positions and took its large deliveries, in whole or in large part, through Defendant Term Commodities.  Defendant Allenberg was a person acting on behalf of, and a person owned or controlled by Defendants Louis Dreyfus Commodities B.V., LDC Holding Inc. and Louis Dreyfus Commodities LLC.

142.    Third, Defendants Louis Dreyfus Commodities B.V., LDC Holding Inc. and Louis Dreyfus Commodities LLC (a) acted through Defendant Allenberg and other affiliates to manipulate prices as alleged herein, and/or (b) knowingly

and intentionally provided, directly or indirectly, financial assistance, credit, credibility, physical facilities and other assistance to such manipulation.

143.   The Defendants were not neophytes in the cotton market. Each well knew of the price distortions and the other publicly available information.  Each actually knew or actually received reports indicating the cotton futures contract positions and conduct of Allenberg, Term Commodities, Inc., and their affiliates. Each had readily available to them the full information regarding such long positions and deliveries.  With such knowledge, each Defendant undertook and/or continued its conduct to allow and further the manipulation.

144.   Defendants undertook the activities alleged herein individually, in concert, and as one another's principal, control person, agent, or otherwise acting on behalf of one another within the meaning of Section 2(a)(1)(b) of the CEA, 7 U.S.C. §2(a)(1)(B).

145.   Each Defendant or its control person or principal or agent or a person acting on its behalf specifically intended their activities alleged herein to move or support the prices of, first, May 2011 Contract prices to that artificial levels and, later, move or support July 2011 Contract prices to or at artificial levels.  As a direct result of such intentional conduct, Defendants' conduct caused such prices and the price trends to be artificial during the Class Period.

146. In each of the foregoing ways as well as in others, Defendants manipulated ICE cotton futures contract prices in violation of Sections 6(c), 6(d), 9(a) and 22(a) of the CEA, 7 U.S.C. §§ 9, 13b, 13(a) and 25(a) during the Class Period.

147. Thereby, Defendants proximately caused Plaintiffs and members of the Class injury for which each is entitled to recover the actual damages resulting from the manipulation and other violations of the CEA.

## AS AND FOR A SECOND CLAIM AGAINST DEFENDANTS FOR AIDING AND ABETTING AND CONTROL PERSON LIABILITY FOR MANIPULATION

148. Plaintiffs incorporate by reference and re-allege the preceding allegations, as though fully set forth herein.

149. To any extent that any Defendant is not liable under the First Claim, then that Defendant is liable under this Claim. The price distortions alleged herein were publicly available during the Class Period. Each Defendant knowingly rendered substantial assistance to such manipulation.

150. Defendant Louis Dreyfus Commodities B.V., and LDC Holding Inc. were the holding companies of Defendants, and willfully aided, abetted, counseled, induced, or procured the commission of violations of the CEA by Defendants.

151. Defendant Louis Dreyfus Commodities LLC is the holding company for various operating companies engaged in LDC's North American businesses of

Defendants, and willfully aided, abetted, counseled, induced, or procured the commission of violations of the CEA by Defendants.

152.   Defendant Term Commodities, Inc. was the clearing member for Defendants, and willfully aided, abetted, counseled, induced, or procured the commission of violations of the CEA by Defendants.

153.   Defendant Allenberg Cotton Co. is a wholly owned division or company of LDC which is engaged in cotton merchandising for Defendants, and willfully aided, abetted, counseled, induced, or procured the commission of violations of the CEA by Defendants.

154.   Defendant Joseph Nicosia, at all times relevant herein, was the Chief Executive Officer of Allenberg Cotton Co. and is the Senior Platform Head Cotton trader of the Louis Dreyfus Commodities Executive Group.  He willfully aided, abetted, counseled, induced, or procured the commission of violations of the CEA by Defendants.

155.   Defendants each played their component role and each knowingly aided, abetted, counseled, induced, and/or procured the violations of the CEA alleged herein.

156.   Defendants willfully intended to assist the manipulation in violation of the CEA.

157.   Plaintiffs and members of the Class are each entitled to damages for the violations alleged herein.

## AS AND FOR A THIRD CLAIM
## AGAINST DEFENDANTS FOR
## VIOLATIONS OF SECTION 1 AND/OR SECTION 1 OF THE
## SHERMAN ACT

158.   Plaintiffs incorporate by reference the preceding allegations.

159.   In violation of Section 1 of the Sherman Act, Defendants entered an agreement, understanding or concerted action between and among Defendants.  In furtherance of this agreement, Defendants fixed and artificially inflated prices for, first, the May 2011 Contract and, later, the July 2011 Contract.  Defendants' conduct constitutes a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

160.   In violation of Section 2 of the Sherman Act, Defendants monopolized, attempted to monopolize, and/or conspired to monopolize the relevant market as previously alleged herein.

161.   This conduct and its resulting impact on the market, including the market for cotton on call contracts, occurred in or affected interstate and international commerce.

162.   As a direct and foreseeable result, Plaintiffs and Class members were injured in their property in that they had to pay artificially high prices for May

2011 Contracts, or July 2011 Contracts, or cotton on call contracts that were based on the prices of the May 2011 Contract or the July 2011 Contract.

## AS AND FOR A FOURTH CLAIM AGAINST DEFENDANTS FOR UNJUST ENRICHMENT

163.  Plaintiffs incorporate by reference and re-allege the preceding allegations, as though fully set forth herein.

164.  Defendants financially benefited from their unlawful acts.  These unlawful acts caused Plaintiffs and other members of the Class to suffer injury, lose money, and transact cotton contracts at artificial prices.

165.  As a result of the foregoing, it is unjust and inequitable for Defendants to have enriched themselves in this manner.

166.  Each Defendant should pay its own unjust enrichment to Plaintiffs and members of the class.

167.  Plaintiffs and members of the Class are entitled to the establishment of a constructive trust impressed on the benefits to Defendants from their unjust enrichment and inequitable conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

(A)    For an order certifying this lawsuit as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, and designating Plaintiffs as the Class representative and their counsel as Class counsel;

(B)    For a judgment awarding Plaintiffs and the Class damages against Defendants for their violations of the CEA, together with prejudgment interest at the maximum rate allowable by law;

(C)    For a judgment awarding Plaintiffs and the Class treble damages against Defendants as a result of their unlawful anticompetitive conduct alleged herein under applicable federal antitrust law;

(D)    For a judgment awarding Plaintiffs and the Class any and all sums of Defendants' unjust enrichment;

(E)    For an order impressing a constructive trust temporarily, preliminarily, permanently or otherwise on Defendants' unjust enrichment, including the portions thereof that were obtained at the expense of Plaintiffs and the Class;

(F)    For an award to Plaintiffs and the Class of their costs of suit, including reasonable attorneys' and experts' fees and expenses; and

(G)    For such injunctive and declaratory relief, and such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiffs respectfully demand a trial by jury.


Dated:      New York, New York
            June 10, 2013

**LOVELL STEWART HALEBIAN
JACOBSON LLP**

By: _____
      Christopher Lovell
      Ian T. Stoll
      Christopher M. McGrath
      Benjamin M. Jaccarino
      Amanda N. Miller
      61 Broadway, Suite 501
      New York, NY 10006
      (212) 608-1900
      (212) 719-4677 (fax)

*Interim Lead Class Counsel*

Linda Nussbaum
**GRANT & EISENHOFER P.A.**
485 Lexington Avenue, 29th Floor
New York, NY 10017
(646) 722-8500

J. Douglas Richards
**COHEN MILSTEIN SELLERS &
TOLL PLLC**
88 Pine Street, 14th Floor
New York, New York 10005
(212) 838-7797

Bernard Persky
**LABATON SUCHAROW LLP**
140 Broadway
New York, New York 10005
(212) 907-0700

William Butterfield
**HAUSFELD LLP**
1700 K Street N.W., Suite 650

Washington, D.C. 20006
(202) 540-7200

Joseph C. Kohn
**KOHN, SWIFT & GRAF, P.C.**
One South Broad Street, Suite 2100
Philadelphia, Pennsylvania 19107
Tel. (215) 238-1700
Fax (215) 238-1968

Fred Isquith
**WOLF HALDENSTIN ADLER
FREEMAN & HERZ LLP**
270 Madison Avenue
New York, New York 10016
Telephone: (212) 545-4600
Facsimile: (212) 545-4653

***Counsel for Plaintiffs***

## <u>CERTIFICATE OF SERVICE</u>

        I hereby certify that on June 10, 2013, I caused to be served the foregoing *Consolidated Amended Complaint* by electronic mail upon the following individuals:

>Kenneth M. Raisler
>Stephen Ehrenberg
>Bruce Edward Clark
>**SULLIVAN & CROMWELL LLP**
>125 Broad Street
>New York, New York 10004-2498
>raislerk@sullcrom.com
>EhrenbergS@sullcrom.com
>clarkb@sullcrom.com
>
>*Counsel for Defendants*

Dated:      New York, New York
             June 10, 2013

>*/s/ Amanda N. Miller*
>Amanda N. Miller
>**LOVELL STEWART HALEBIAN**
>      **JACOBSON LLP**
>61 Broadway, Suite 501
>New York, New York 10006