**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

IN RE:  TERM COMMODITIES COTTON :
FUTURES LITIGATION                            :
                                                                :     MASTER DOCKET
                                                                :     No. 12-cv-5126 (ALC) (KNF)
                                                                :
                                                                :
This Document Relates To:  All Actions     :
                                                                :
                                                                :
- - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR**
**MOTION TO EXCLUDE THE TESTIMONY OF DR. CRAIG PIRRONG**

Stephen Ehrenberg
William H. Wagener
Katherine L. Bagley
Harry F. Murphy
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588

Kenneth M. Raisler
*Of Counsel*

*Attorneys for Defendants*

November 18, 2019

# TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ..................................................................................................... 5

    A.    Deliverable Supply Analysis ................................................................ 6

    B.    Artificiality Analysis .......................................................................... 7

    C.    Causation Analysis ............................................................................. 9

    D.    Legal Conclusions and Opinions Regarding Defendants' State of Mind ............ 10

LEGAL STANDARD ............................................................................................ 10

ARGUMENT ....................................................................................................... 11

I.    DR. PIRRONG'S DELIVERABLE SUPPLY ANALYSIS CONTRADICTS CASE LAW AND ARBITRARILY EXCLUDES AVAILABLE SOURCES OF COTTON ................................................................................................ 11

    A.    Dr. Pirrong's First and Second Analyses Are Plainly Contrary to Law .............. 11

    B.    Dr. Pirrong's Third Analysis Is Also Unreliable Because It Arbitrarily Excludes Cotton That Prudent Shorts Could Have Delivered ............................. 14

        1.    Dr. Pirrong Improperly Excludes Sources of Cotton That Prudent Shorts Could Have Accessed, Including In-Transit Cotton ...................... 14

        2.    Dr. Pirrong's Categorical Exclusion of "Western Region" Cotton Is Contrary to Case Law ................................................................ 15

        3.    Dr. Pirrong Makes Assumptions About Warehouse Capacity and Timing That Are Baseless and/or Contradicted by the Factual Record ................................................................................... 16

II.    DR. PIRRONG'S ARTIFICIALITY MODEL IS UNRELIABLE ........................... 17

    A.    Dr. Pirrong Uses an Unfounded Event Window That Arbitrarily Inflates the Purported "Artificiality" That Dr. Pirrong Estimates ..................... 17

    B.    Dr. Pirrong's Event Studies Do Not Account for the Uniqueness of the 2010–2011 Crop Season and Produce Numerous False Positives ................. 19

III.    **DR. PIRRONG'S OPINIONS REGARDING CAUSATION ARE UNRELIABLE BECAUSE HE FAILS TO ANALYZE THE CONNECTION BETWEEN DEFENDANTS' FUTURES POSITIONS AND ALLEGED "ARTIFICIALITY."** ................................................................ 20

      A.    Dr. Pirrong's Reliance on Excess Open Interest as a "Signal" Causing "Panicked" Shorts To Bid Up Prices Is Unsupported Speculation ...................... 20

      B.    Dr. Pirrong Fails To Demonstrate a Relationship Between "Artificiality" and Either Open Interest or Defendants' Futures Trading .................................... 21

      C.    Dr. Pirrong Fails To Consider Alternative Causes of "Artificial" Prices ............. 22

IV.    **DR. PIRRONG'S LEGAL OPINIONS AND OPINIONS REGARDING DEFENDANTS' STATE OF MIND ARE CLEARLY INADMISSIBLE** ................. 23

      A.    Dr. Pirrong's Legal Analyses and Conclusions Are Inadmissible ....................... 23

      B.    Dr. Pirrong's Opinions Regarding Defendants' State of Mind Are Inadmissible .............................................................................................. 24

**CONCLUSION** .................................................................................................... 25

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Amorgianos* v. *Amtrak*,
303 F.3d 256 (2d Cir. 2002).................................................................10, 11, 12

*Board of Trs. of AFTRA Ret. Fund* v. *JPMorgan Chase Bank, N.A.*,
2011 WL 6288415 (S.D.N.Y. Dec. 15, 2011) .......................................................20

*Boucher* v. *U.S. Suzuki Motor Corp.*,
73 F.3d 18 (2d Cir. 1996)....................................................................................17

*Brooks* v. *Outboard Marine Corp.*,
234 F.3d 89 (2d Cir. 2000)..................................................................................22

*Cargill, Inc.* v. *Hardin*,
452 F.2d 1154 (8th Cir. 1971) .............................................................................6

*CFTC* v. *Moncada*,
2014 WL 2945793 (S.D.N.Y. June 30, 2014) ...................................................5, 23

*In re Cox*,
1987 WL 106879 (CFTC July 15, 1987) ...................................................... *passim*

*Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993)....................................................................................2, 4, 11

*In re Elec. Books Antitrust Litig.*,
2014 WL 1282298 (S.D.N.Y. Mar. 28, 2014) .........................................3, 16, 22

*FAA* v. *Landy*,
705 F.2d 624 (2d Cir. 1983)................................................................................24

*Gen. Elec. Co.* v. *Joiner*,
522 U.S. 136 (1997)......................................................................................18, 20

*Hebert* v. *Lisle Corp.*,
99 F.3d 1109 (2d. Cir. 1996)....................................................................12, 14, 15

*Hershey* v. *Pac. Inv. Mgmt. Co. LLC*,
697 F. Supp. 2d 945 (N.D. Ill. 2010) ..........................................................5, 22, 23

*In re Ind. Farm Bureau Coop. Ass'n, Inc.*,
1982 WL 30249 (CFTC Dec. 17, 1982) .........................................................2, 11, 13

*In re Initial Pub. Offering Sec. Litig.*,
   174 F. Supp. 2d 61 (S.D.N.Y. 2001)......................................................................5

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
   299 F. Supp. 3d 430 (S.D.N.Y 2018)............................................................. *passim*

*Kumho Tire Co.* v. *Carmichael*,
   526 U.S. 137 (1999)......................................................................................10

*Loeffel Steel Prod., Inc.* v. *Delta Brands, Inc.*,
   387 F. Supp. 2d 794 (N.D. Ill. 2005) ...............................................2, 12, 14, 15

*Luitpold Pharm., Inc.* v. *Ed. Geistlich Sohne A.G. Fur Chemische Industrie*,
   2015 WL 5459662 (S.D.N.Y. Sept. 16, 2015)......................................................17

*Malletier* v. *Dooney & Bourke, Inc.*,
   525 F. Supp. 2d 558 (S.D.N.Y. 2007)...........................................................12, 14, 15

*Marx & Co.* v. *Diners' Club Inc.*,
   550 F.2d 505 (2d Cir. 1977)...............................................................................23

*In re Mirena IUD Prods. Liab. Litig.*,
   169 F. Supp. 3d 396 (S.D.N.Y. 2016).............................................................17, 25

*In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig.*,
   341 F. Supp. 3d 213 (S.D.N.Y. 2018)..............................................................4, 21

*Nimely* v. *City of New York*,
   414 F.3d 381 (2d Cir. 2005).........................................................................11, 18, 20

*Point Prods. A.G.* v. *Sony Music Entm't, Inc.*,
   2004 WL 345551 (S.D.N.Y. Feb. 23, 2004).........................................................5

*Reed Const. Data Inc.* v. *McGraw-Hill Cos.*,
   49 F. Supp. 3d 385 (S.D.N.Y. 2014)....................................................................18

*In re Rezulin Prods. Liab. Litig.*,
   309 F. Supp. 2d 531 (S.D.N.Y. 2004)...........................................................23, 24

*Teamsters Local 445 Freight Div. Pension Fund* v. *Bombardier, Inc.*,
   546 F.3d 196 (2d Cir. 2008)..............................................................................17

*In re Term Commodities Cotton Futures Litig.*,
   2013 WL 9815198 (S.D.N.Y. Dec. 20, 2013) .....................................................13

*United States* v. *Scop*,
   846 F.2d 135 (2d Cir. 1988)................................................................................23

*Volkart Brothers, Inc.* v. *Freeman*,
   311 F.2d 52 (5th Cir. 1962) ...........................................................................................3, 13

*Whalen* v. *CSX Transp. Inc.*,
   2016 WL 5723877 (S.D.N.Y. Sept. 29, 2016).........................................................................11

**Other Authorities**

Fed. R. Evid. 403 ...........................................................................................................................11

Fed. R. Evid. 702 ...........................................................................................................................10

Defendants Louis Dreyfus Company B.V., Louis Dreyfus Company Holding Inc., Louis Dreyfus Company LLC, Term Commodities Inc., Louis Dreyfus Company Cotton LLC (a/k/a Allenberg Cotton Co.), and Joseph Nicosia (collectively, "Defendants") respectfully submit this Memorandum of Law in Support of Their Motion to Exclude the Testimony of Dr. Craig Pirrong.

## PRELIMINARY STATEMENT

Plaintiffs' expert Dr. Craig Pirrong has made a career out of seeking to expand liability for commodities manipulation beyond its legal bounds.  Dr. Pirrong has advocated for less regulation and more private litigation, arguing that CFTC precedent defines "manipulation" so narrowly as to make proof of manipulation impossible and that "[t]he CFTC and the courts have too often lacked understanding" of "the nature of manipulation, and the econometric and statistical tools that can be used to detect it."  (Ex. 68 at 62.)[1]  Dr. Pirrong's practice of offering analyses using his expansive *personal* definition of manipulation has proved lucrative— ▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

Dr. Pirrong offers three principal analyses in this case:  (i) a "deliverable supply" analysis, purportedly demonstrating that Defendants had the ability to influence the prices of the May 2011 ICE Cotton No. 2 futures contract (the "May Contract") and the July 2011 ICE Cotton No. 2 futures contract (the "July Contract"); (ii) event studies supposedly demonstrating that the prices of the May and July Contracts were artificially high; and (iii) a causation analysis purportedly demonstrating that Defendants "caused" the supposedly artificially high prices

---

[1]     Citations to "Ex. _" are to exhibits to the Declaration of William H. Wagener, dated November 18, 2019, submitted herewith.

identified by his models.  Dr. Pirrong's analyses are contrary to law, rely on arbitrary or incomplete data, produce "false positives," and fail to consider market specific factors that caused price movements in the May and July Contracts.  He also offers baseless legal conclusions and speculative opinions about Defendants' and other market participants' mental states.  These opinions are unreliable, likely to mislead a jury, and must be excluded under Federal Rules of Evidence 403 and 702 and *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

> ***Deliverable Supply Analysis.***  Dr. Pirrong uses three separate methodologies to estimate "deliverable supply" (generally speaking, the amount of cotton available to settle cotton futures)—each relying on variations of his personal definition of that term.  ███████

███████████████████████████████████████████████

███████████████████  This conclusion is contrary to CFTC precedent holding that only "irrevocably committed" stocks of a commodity should be excluded from deliverable supply.  *In re Ind. Farm Bureau Coop. Ass'n, Inc.*, 1982 WL 30249, at *13 (CFTC Dec. 17, 1982).  While Dr. Pirrong admits that he disagrees with settled case law and purports to supplant legal precedent with his idiosyncratic theories that "*Indiana Farm Bureau* and [another CFTC decision] use extremely liberal definitions of deliverable supplies" (Ex. 68 at 61), "[e]xpert opinions that are contrary to law are inadmissible."  *Loeffel Steel Prod., Inc.* v. *Delta Brands, Inc.*, 387 F. Supp. 2d 794, 806 (N.D. Ill. 2005).[2]

███████████████████████████████████

███████████████████████████████████████████████

---

[2]      Unless otherwise noted, all internal quotation marks and internal citations are omitted.

[3]      "First Notice Day" is the first day of the "notice period" during which shorts announce their intention to deliver cotton.  (Ex. 2 ¶ 19 n.20.)

████████      In addition to impermissibly excluding non-irrevocably "committed" cotton, this second approach also fails to account for the legal requirement that shorts engage in prudent planning to deliver more than just the certificated stock in ICE warehouses during the delivery period.  *See*, *e.g.*, *Volkart Brothers, Inc.* v. *Freeman*, 311 F.2d 52, 60 (5th Cir. 1962).  Although Dr. Pirrong's personal opinion is that the "reasoning employed in [*Volkart*]" is wrong because it is often "uneconomical" for shorts to prepare to deliver (Ex. 68 at 61), that is not the law.

████████████████████████████

████████████████████████████████      In addition to impermissibly excluding all "committed" cotton and excluding millions of bales of cotton that prudent shorts could have delivered, this approach unilaterally excludes cotton from the "Western Region" of the United States that must be included under CFTC precedent.  *See In re Cox*, 1987 WL 106879, at *5 (CFTC July 15, 1987) ("[T]he fact that the local supply of a commodity is scarce does not release the shorts from their obligation to honor their contractual commitments to deliver.").  Unsurprisingly, Dr. Pirrong's personal view is that *Cox* is wrong, and that one should "punish" longs that allegedly corner futures markets "regardless of the precautions shorts take."  (Ex. 68 at 61.)  In addition to violating settled law, Dr. Pirrong's third approach also is "based on demonstrably false assumptions" regarding warehouse capacity and shipping capability, rendering it inadmissible under Rules 403 and 702.  *In re Elec. Books Antitrust Litig.*, 2014 WL 1282298, at *7 (S.D.N.Y. Mar. 28, 2014).

**Event Studies Purportedly Estimating "Artificiality."**  Dr. Pirrong conducted event studies purporting to show that there were artificially high prices in the May and July

Contracts.[4]  These event studies are unreliable because they rely on arbitrary event windows that mirror the class periods in the Complaint (which, conveniently for Plaintiffs, maximize claimed artificiality).  But the results of Dr. Pirrong's study are drastically affected by any slight shift in the event window—a sign of an unreliable analysis.  *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 484 (S.D.N.Y. 2018) (artificiality model was "unreliable" where expert had "cherry-pick[ed]" event window, which was a "significant driver" of his results).  Dr. Pirrong's methodology also produces numerous false positives, in that it finds artificiality in peculiar places—in futures other than the May and July Contracts, and in the May and July Contracts at times other than when Defendants allegedly engaged in manipulation.  These deficiencies warrant exclusion.  *See*, *e.g.*, *Daubert*, 509 U.S. at 594 (courts should consider "known or potential rate of error" of method); *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig.*, 341 F. Supp. 3d 213, 241 (S.D.N.Y. 2018) ("Opinions that assume a conclusion and reverse-engineer a theory to fit that conclusion are . . . inadmissible.").

       ***Causation Analysis.***  Dr. Pirrong contends that Defendants caused artificial prices by establishing large long positions in the May and July Contracts that created "excess open interest," then holding out for artificially high prices when shorts perceived the "threat" that Defendants would take delivery rather than liquidate their futures.  But Dr. Pirrong does not test for the relationship he posits between Defendants' positions or open interest and "artificiality."  Nor does he isolate the price impact of Defendants' alleged misconduct from other factors (such as the unique market conditions in the 2010-2011 cotton crop season).  Finally, his analysis

---

[4]      An event study is a statistical technique that can be used to estimate whether the price of a financial instrument "reacted significantly to a particular event."  (Ex. 6 ¶ 24.)  Event studies attempt to estimate the impact of events by predicting the price of a dependent variable based on one or more independent variables over a particular period of time known as the "event window."  (*Id.*; *see also id.* ¶¶ 17-18.)

ignores that the Intercontinental Exchange ("ICE")—the futures market regulator—actively managed down Defendants' position, making it impossible for Defendants to have "threatened" anyone or to have held out for artificially high prices. These "fatal flaw[s]" warrant exclusion. *Hershey* v. *Pac. Inv. Mgmt. Co. LLC*, 697 F. Supp. 2d 945, 957 (N.D. Ill. 2010) (excluding Dr. Pirrong's opinions for "fatal flaw" of failing to "attribute[] loss between Defendants' alleged unlawful conduct and that which was not fraudulent [and to] quantitatively consider the effect of other possible causes"); *see also Point Prods. A.G.* v. *Sony Music Entm't, Inc.*, 2004 WL 345551, at *7 (S.D.N.Y. Feb. 23, 2004) (excluding opinion based on "sometimes questionable assumptions" and with "gaping omissions of real world events that were highly material").

### *Inadmissible Legal Conclusions and Opinions Regarding State of Mind.*

Dr. Pirrong's report is replete with inadmissible legal conclusions—including his repeated assertion that Defendants engaged in "classic manipulative conduct" and that Defendants' actions "constitute classical conduct to squeeze and corner." (Ex. 14 ¶¶ 2(a), 2(d); *see also* App'x A.) The only thing "classic" here is that experts cannot tell the jury what legal conclusion to reach. *See In re Initial Pub. Offering Sec. Litig.*, 174 F. Supp. 2d 61, 64 (S.D.N.Y. 2001) (noting "axiomatic principle" that "prohibit[s] experts from providing their legal opinions"). Dr. Pirrong also impermissibly opines on the knowledge and intent of Defendants. *See, e.g.*, *CFTC* v. *Moncada*, 2014 WL 2945793, at *4-5 (S.D.N.Y. June 30, 2014) (striking expert testimony about trader's lack of intent to manipulate market for wheat futures).

### BACKGROUND

Dr. Pirrong is a finance professor who is admittedly not an expert on the cotton market. (Ex. 27 at 12:17-14:2.) Dr. Pirrong's writings on the commodities market include an article arguing that the CFTC and courts interpret commodities "manipulation" too narrowly and "deliverable supply" too broadly, and that *ex ante* regulation of commodities trading (*e.g.*,

position limits and real-time monitoring of the sizes of futures positions) was inferior to punishing manipulation *ex post* in civil litigation.  (*See generally* Ex. 68.)

Dr. Pirrong has submitted numerous reports in this case, ████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████ This motion focuses on opinions set forth primarily in his amended initial report dated February 8, 2016 (as clarified and supplemented in later reports dated April 15, July 11, July 18, September 23, and November 14, 2016).[5]

## A.    Deliverable Supply Analysis

Dr. Pirrong offers three methodologies for estimating deliverable supply (generally, the amount of cotton available to be "delivered" to satisfy short cotton futures contracts).  *See Cargill, Inc.* v. *Hardin*, 452 F.2d 1154, 1164 (8th Cir. 1971) (noting that an "essential element" of a Commodities Exchange Act claim is "establish[ing] that there were not adequate supplies" that shorts could use to "fulfill their delivery requirements on the future").

████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████

████████████████████████████████████

██████████████████████████████████████████

---

[5]      Dr. Pirrong's initial report was originally submitted on January 19, 2016, supplemented on January 27, 2016, and amended on February 8, 2016.



**B.    Artificiality Analysis**

Dr. Pirrong also uses event-study analyses to estimate the alleged "artificiality" in the prices of both the May and July Contracts.  (Ex. 14 ¶¶ 185, 430.)

**C.      Causation Analysis**

Dr. Pirrong then attributes 100% of the alleged artificiality for both the May and July Contracts to Defendants' alleged misconduct.  (*See* Ex. 14 ¶¶ 273, 465; Ex. 27 at 206:5-25.)

Open interest is the number of futures contracts in a delivery month that have not yet been liquidated or closed by either physical delivery or an offsetting transaction.  (*See* Third Consolidated Amended Complaint ("TCAC"), ECF No. 484, ¶ 52(a); Ex. 2 ¶ 29.)

███████████████████████████████████████

████████████████████████

### D.   Legal Conclusions and Opinions Regarding Defendants' State of Mind

In addition to speculating that shorts perceived "threats" when trading the May and July Contracts, Dr. Pirrong offers several legal conclusions and opinions regarding Defendants' state of mind.  For example, Dr. Pirrong concludes that Defendants' acts were "classical conduct to squeeze and corner manipulatively."  (Ex. 14 ¶ 2(a).)  Dr. Pirrong further opines that this manipulation was carried out with "the specific intent of exercising market power and distorting prices."  (*Id.* ¶¶ 66-67.)  Dr. Pirrong comments on Defendants' intent throughout his report, as summarized in Appendix A to this brief.

## LEGAL STANDARD

Under Federal Rule of Evidence 702, "a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify" only if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Courts should consider, *inter alia*, "whether a theory or technique can be (and has been) tested" and whether it "has been subjected to peer review and publication"; the technique's "known or potential rate of error"; whether there are "standards controlling the technique's operation"; and whether the technique or theory has attained "general acceptance."  *Amorgianos* v. *Amtrak*, 303 F.3d 256, 266 (2d Cir. 2002) (applying *Daubert*, 509 U.S. at 593-94); *see Kumho Tire Co.* v. *Carmichael*, 526 U.S. 137, 150 (1999) (courts should consider "nature of the issue, the expert's particular expertise, and the subject of his testimony").  Crucially, an "expert's methodology is to be assessed step-by-step, and it is critical that an expert's analysis be reliable at every step. . . .

[A]ny step that renders the analysis unreliable under the Daubert factors renders the expert's testimony inadmissible." *LIBOR*, 299 F. Supp. 3d at 467; *see Amorgianos*, 303 F.3d at 267 (same).  "The proponent of expert testimony bears the burden of establishing its admissibility by a preponderance of the evidence."  *Whalen* v. *CSX Transp. Inc.*, 2016 WL 5723877, at *8 (S.D.N.Y. Sept. 29, 2016).

"In addition to the requirements of Rule 702, expert testimony is subject to Rule 403 . . . ."  *Nimely* v. *City of New York*, 414 F.3d 381, 397 (2d Cir. 2005).  Even where an expert is qualified, expert testimony may be excluded "if its probative value is substantially outweighed by a danger of one or more of the following:  unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  Because "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it . . . the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more power over experts than over lay witnesses."  *Daubert*, 509 U.S. at 595; *Nimely*, 414 F.3d at 397 (noting "uniquely important role that Rule 403 has to play in a district court's scrutiny of expert testimony").

## ARGUMENT

### I.   DR. PIRRONG'S DELIVERABLE SUPPLY ANALYSIS CONTRADICTS CASE LAW AND ARBITRARILY EXCLUDES AVAILABLE SOURCES OF COTTON.

#### A.   Dr. Pirrong's First and Second Analyses Are Plainly Contrary to Law.

***First Methodology.***  ███████████████████████████

████████████████████████████████████████

███████████████████████████████████  CFTC precedent holds that only "*irrevocably* committed" commodity stocks should be excluded from deliverable supply.  *Ind. Farm*, 1982 WL 30249, at *13 (emphasis added); *see Cox*, 1987 WL 106879, at *5

(ALJ erred in excluding from deliverable supply wheat that was "committed" to sales contracts, where sellers had "[a] sufficient time interval" to deliver in the futures market, and acquire new stocks to satisfy sales contracts).  Dr. Pirrong does not even argue (much less demonstrate) that all cotton in the United States was irrevocably committed.  ██████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████

　　　　　Dr. Pirrong's analysis is consistent with his academic disagreement with *Indiana Farm* and *Cox*, which he says use "extremely liberal definitions of deliverable supplies."  (Ex. 68 at 61.)  But an expert opinion contrary to law usurps the court's authority to instruct the jury, is inherently misleading and confusing, and must be excluded.  *See, e.g.*, *Hebert* v. *Lisle Corp.*, 99 F.3d 1109, 1117 (2d. Cir. 1996) (encouraging "exercise of the trial court's gatekeeper authority" where expert opines using "markedly incorrect law"); *Malletier* v. *Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 663 (S.D.N.Y. 2007) ("The problem with this [expert] analysis is that it is at odds with the substantive law . . . ."); *Loeffel Steel*, 387 F. Supp. 2d at 806 ("Expert opinions that are contrary to law are inadmissible.").

　　　　　***Second Methodology.***  Dr. Pirrong's second deliverable supply methodology is fatally flawed and must be excluded.  ████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████　　*See* Argument § I.A, *supra*; *Amorgianos*, 303 F.3d at 267 (failure at "any step" renders entire analysis unreliable).

██████████████████████████████████████████

█████████████████████████████ ██ ████████████████        Dr. Pirrong ignores that, as a

matter of law, shorts must engage in prudent planning—and that bales which could have been

certificated are part of deliverable supply.  As this Court has recognized, "the CFTC [has]

rejected the notion that a short is not required to plan ahead for delivery."  *In re Term*

*Commodities Cotton Futures Litig.*, 2013 WL 9815198, at *13 (S.D.N.Y. Dec. 20, 2013) (citing

*Cox*, 1987 WL 106879, at *6 (deliverable supply must be measured by reference to the amount

that shorts could deliver with prudent planning)); *see also Ind. Farm*, 1982 WL 30249, at *11

("[I]t is irresponsible market behavior for shorts to enter the delivery month, especially where

low cash supplies are evident, without making adequate delivery preparations.").  And the Fifth

Circuit has made clear that shorts should not "be excused from the performance of their contracts

and from the exercise of due diligence to that end."  *Volkart*, 311 F.2d at 59-60 (district court

erred in disregarding more than one million "bales of uncertificated cotton stored at ports

designated as delivery points" in "determining the size of the available supply upon the simple

finding that on [the last delivery day] the shorts did not have time to purchase" and certificate

tenderable cotton).

    Although Dr. Pirrong personally disagrees with these cases and would not

obligate shorts to prepare to deliver (*see* Ex. 68 at 61), this Court has already recognized that

they apply here.  *See*, *e.g.*, *In re Term Commodities Cotton Futures Litig.*, 2013 WL 9815198,

at *9, *11-12.  Because Dr. Pirrong's second methodology makes no effort to account for the

---

[6]  █████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████

amount of cotton that shorts would have been able to deliver with prudent planning, it must be excluded. *See, e.g.*, *Hebert*, 99 F.3d at 1117; *Malletier*, 525 F. Supp. 2d at 663; *Loeffel Steel*, 387 F. Supp. 2d at 806.

> **B.**     **Dr. Pirrong's Third Analysis Is Also Unreliable Because It Arbitrarily Excludes Cotton That Prudent Shorts Could Have Delivered.**



This methodology again impermissibly excludes "committed" cotton, contrary to CFTC precedent. (*See* Ex. 14 ¶ 119; Argument § I.A., *supra*.) Although broader than his first two methodologies, Dr. Pirrong's methodology is also unreliable, overly restrictive, and misleading to the jury for three additional reasons.

> **1.**     *Dr. Pirrong Improperly Excludes Sources of Cotton That Prudent Shorts Could Have Accessed, Including In-Transit Cotton.*

As a matter of law, EWR data are not suitable for measuring deliverable supply, because the CFTC has held that in-transit commodities—excluded

---

[7]     "Receipted" bales of cotton are bales that are already in a warehouse and for which a receipt has been generated. (Ex. 3 ¶ 35.) "Unreceipted" bales are either not yet in a warehouse or bales for which a receipt has not been generated. (*Id.* ¶¶ 34-36.)

from EWR data—*are* part of deliverable supply.  *See Cox*, 1987 WL 106879, at *6 (wheat

loaded on barges should be included in deliverable supply).

> 2.      *Dr. Pirrong's Categorical Exclusion of "Western Region" Cotton Is Contrary to Case Law.*



The CFTC

rejected that very argument in *Cox*, holding that "the fact that the local supply of a commodity is

scarce does not release the shorts from their obligation to honor their contractual commitments to

deliver" and that the supposed abnormality of delivery from a region is irrelevant.  1987 WL

106879, at *6 (rejecting argument that wheat in Kansas City was not deliverable because Kansas

City is "outside the 'normal' supply area for Chicago").  "That is particularly true when the short

is an experienced futures market participant, sufficiently skilled to locate out-of-town [stocks] on

short notice."  *Id.*  Regardless of Dr. Pirrong's view that shorts should not be required to prepare

to deliver if doing so would be "uneconomic" (*see* Ex. 68 at 61),

*See, e.g.*, *Hebert*, 99 F.3d

at 1117;  *Malletier*, 525 F. Supp. 2d at 663; *Loeffel Steel*, 387 F. Supp. 2d at 806.

To state the obvious, actual deliveries from a region refutes the notion that

commodities in that region were not "deliverable."  *See Cox*, 1987 WL 106879, at *7 (Kansas

City wheat was deliverable to Chicago, because Kansas City wheat was shipped even farther to New Orleans and Buffalo).  Dr. Pirrong's disregard of actual market data makes his analysis unreliable.  *See*, *e.g.*, *Elec. Books*, 2014 WL 1282298, at *7 (expert analyses "based on demonstrably false assumptions" are unreliable, misleading to the jury, and must be excluded under Rules 403 and 702).

3. *Dr. Pirrong Makes Assumptions About Warehouse Capacity and Timing That Are Baseless and/or Contradicted by the Factual Record.*



Because Dr. Pirrong's factual assumptions are demonstrably erroneous, his third analysis is unreliable and must be excluded.  *See*, *e.g.*, *Boucher* v. *U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (courts have "discretion under Federal Rule of Evidence 703 to determine whether the expert acted reasonably in making assumptions of fact"); *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 448 (S.D.N.Y. 2016) (excluding expert theory that "has no known error rate"); *Luitpold Pharm., Inc.* v. *Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, 2015 WL 5459662, at *8 (S.D.N.Y. Sept. 16, 2015) (precluding expert testimony "not drawn from any verifiable data").

## II.    DR. PIRRONG'S ARTIFICIALITY MODEL IS UNRELIABLE.

"An event study may be rejected . . . if it is methodologically unsound or unreliable."  *Teamsters Local 445 Freight Div. Pension Fund* v. *Bombardier, Inc.*, 546 F.3d 196, 208 n.15 (2d Cir. 2008).  Dr. Pirrong's event studies are methodologically unsound, unreliable, and must be rejected.

### A.    Dr. Pirrong Uses an Unfounded Event Window That Arbitrarily Inflates the Purported "Artificiality" That Dr. Pirrong Estimates.

Event studies are typically used in situations, like securities fraud cases with an obvious "corrective disclosure" correcting a prior misstatement or omission, where particular event dates can be readily identified.  (Ex. 6 ¶¶ 24-25.)  Given the focus on price movements near the time of a discernible event, the event window (the time period surrounding the event) that is selected is of central importance.  (*Id.*)

Here, Dr. Pirrong's event window bears no rational relation to the event study; it mirrors the alleged class period rather than his own proffered criteria for event period selection.  (*See* TCAC ¶ 1(d).) ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉



Whatever that means, it is not scientific, and "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co.* v. *Joiner*, 522 U.S. 136, 146 (1997); *see also, e.g.*, *Nimely*, 414 F.3d at 396 (same). Rather, "inconsistent results are an indicia of unreliability in an expert's methodologies." *LIBOR*, 299 F. Supp. 3d at 468.

Dr. Pirrong's event studies must be excluded because "where, as here, very minor changes in arbitrarily selected model parameters can entirely alter the model's conclusions, that model is insufficiently robust to withstand the scrutiny of Rule 702." *Reed Const. Data Inc.* v. *McGraw-Hill Cos.*, 49 F. Supp. 3d 385, 407 (S.D.N.Y. 2014), *aff'd*, 638 F. App'x 43 (2d Cir. 2016); *see also LIBOR*, 299 F. Supp. 3d at 483-84 (artificiality model was "unreliable" where expert had

8

"cherry-pick[ed]" event window, which was a "significant driver" of his results, and lacked a "robust explanation for why [selected window] does not skew the results").

**B.    Dr. Pirrong's Event Studies Do Not Account for the Uniqueness of the 2010–2011 Crop Season and Produce Numerous False Positives.**

The 2010–2011 cotton crop season had record high prices and volatility long before the period that Plaintiffs allege Defendants manipulated the market.  (*See* Ex. 2 ¶¶ 62-63.) Dr. Pirrong's event studies do not account for the unique nature of the 2010–2011 crop season (including increased demand and reduced supply compared to other years (*see* Ex. 6 ¶¶ 33-36)), as demonstrated by the fact that they produce false positives. ████████████

████████████████████████████████████████

████████████████████████████████

But Plaintiffs do not contend (nor is there any reason to believe) that cotton futures prices were artificially high as a *result of manipulation* in those futures contracts or in those periods— meaning that Dr. Pirrong's model picks up false positives.

A model that easily finds "artificiality" *absent* a shred of evidence of manipulation is unreliable and risks misleading the jury into finding liability where none exists. In *LIBOR*, the court excluded an expert report that found artificiality in *both* an allegedly manipulated period and "clean periods" without alleged manipulation.  *See LIBOR*, 299 F. Supp. 3d at 479-80 (model that produced statistically significant results when applied outside alleged manipulation period "undermine[d] the reliability of the [study]" in alleged manipulation period). The same is true here; the false positives generated by Dr. Pirrong's artificiality model indicate "either an unreliable model or a deeper flaw in . . . plaintiffs' theory of the case," and mean that Dr. Pirrong's event studies should be excluded.  *Id.* at 480.

III.  **DR. PIRRONG'S OPINIONS REGARDING CAUSATION ARE UNRELIABLE BECAUSE HE FAILS TO ANALYZE THE CONNECTION BETWEEN DEFENDANTS' FUTURES POSITIONS AND ALLEGED "ARTIFICIALITY."**

Dr. Pirrong's theory of causation is that by ███████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
████████████████████████  As described below, Dr. Pirrong's theory is speculative and ignores available data and market realities (in particular, the role ICE plays in ensuring orderly trading and contract expiration).  Moreover, Dr. Pirrong provides no support whatsoever for the proposition that high open interest has any relationship to artificial prices.

A.  **Dr. Pirrong's Reliance on Excess Open Interest as a "Signal" Causing "Panicked" Shorts To Bid Up Prices Is Unsupported Speculation.**

███████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
██████████████████████████████████████████████
█████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████████████  This renders Dr. Pirrong's *ipse dixit* inadmissible.  *See Joiner*, 522 U.S. at 146; *Nimely*, 414 F.3d at 396; *Board of Trs. of AFTRA Ret. Fund* v.

*JPMorgan Chase Bank, N.A.*, 2011 WL 6288415, at *8 (S.D.N.Y. Dec. 15, 2011) ("[O]pinions concerning state of mind are an inappropriate topic for expert opinion.").

████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████████████

███████████████████

**B.**     **Dr. Pirrong Fails To Demonstrate a Relationship Between "Artificiality" and Either Open Interest or Defendants' Futures Trading.**

███████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

But expert "[o]pinions that assume a conclusion and reverse-engineer a theory to fit that conclusion are . . . inadmissible." *Mirena IUS*, 341 F. Supp. 3d at 241; *see also LIBOR*, 299 F. Supp. 3d at 468 ("[I]nconsistent results are an indicia of unreliability in an expert's methodologies.").

███████████████████████████

█████████████████████████████████████

█████████████████████████████████████

█████████ "The failure to test a theory of causation can justify a trial court's exclusion of the expert's testimony." *Brooks* v. *Outboard Marine Corp.*, 234 F.3d 89, 92 (2d Cir. 2000). Dr. Pirrong's testimony should be excluded for that reason.

### C.   Dr. Pirrong Fails To Consider Alternative Causes of "Artificial" Prices.

Even assuming *arguendo* that prices were "artificial," as there can be multiple causes of an artificial price, the cases require that the defendant's role be isolated from those other causes.  *See Cox*, 1987 WL 106879, at *12.  An expert whose analysis fails to control for alternative causes should be excluded.  *See*, *e.g.*, *LIBOR*, 299 F. Supp. 3d at 487 ("Because [expert's artificiality] models offer no means of controlling for the effects of economic events and business developments . . . they cannot reliably support [expert's] causation opinion."); *Elec. Books*, 2014 WL 1282298, at *7 (S.D.N.Y. Mar. 28, 2014) (excluding expert opinion that "fail[ed] to control for other expected causes of price decreases"); *Hershey*, 697 F. Supp. 2d at 955, 957 (excluding Dr. Pirrong's testimony where he offered no "quantitative statistical analysis" to isolate effect of alleged unlawful conduct).

███████████████████████████

█████████████████████████████████████

████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

This alone is an independent basis for the exclusion of Dr. Pirrong's opinions.

## IV.   DR. PIRRONG'S LEGAL OPINIONS AND OPINIONS REGARDING DEFENDANTS' STATE OF MIND ARE CLEARLY INADMISSIBLE.

Black-letter law provides that "expert testimony on issues of law is inadmissible," *Moncada*, 2014 WL 2945793 at *2 (citing *United States* v. *Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991)), and that "[i]nferences about the intent or motive of parties . . . lie outside the bounds of expert testimony," *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004).  The Court should exclude Dr. Pirrong's opinions on both topics.

### A.   Dr. Pirrong's Legal Analyses and Conclusions Are Inadmissible.

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████  An expert may "tell the jury whether he thinks the method of trading was normal but *not* . . . whether it amounted to illegal manipulation . . . ."  *Marx & Co.* v. *Diners' Club Inc.*, 550 F.2d 505, 512 (2d Cir. 1977) (emphasis added); *see also*, *e.g.*, *United States* v. *Scop*, 846 F.2d 135, 140 (2d Cir. 1988) (expert's use of "the language of the statute and accompanying regulations concerning 'manipulation' and 'fraud'" was inadmissible legal conclusion).  Indeed, Dr. Pirrong's opinions here are remarkably similar to his opinions that were excluded in *Hershey*.  *See* 697 F. Supp. 2d at 958 (excluding "Dr. Pirrong's opinions regarding [the defendant's] alleged 'manipulative' conduct and [the defendant's] duties and obligations" as improper because they were "regarding ultimate issues and legal conclusions").[9]

---

[9]   In *Hershey*, Dr. Pirrong alleged that the defendant used a "classic repo squeeze strategy." (Ex. 21 ¶ 76.)  Dr. Pirrong's central thesis was that the defendant used a "'market power manipulation . . . also known as 'a corner' or 'a squeeze.'"  (*Id.* ¶¶ 28, 45.)  ████████████████
██████████████████████████████████████████
████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████     This type of legal analysis is inadmissible and should be excluded.  *See,*

*e.g.*, *FAA* v. *Landy*, 705 F.2d 624, 632 (2d Cir. 1983) (affirming exclusion of former FAA

supervisor's testimony about his "understanding of the meaning and applicability of

[regulations]," which "would invade the province of the court to determine the applicable law

and to instruct the jury as to that law").

    **B.**    **Dr. Pirrong's Opinions Regarding Defendants' State of Mind**
        **Are Inadmissible.**

    Dr. Pirrong sets forth various impermissible opinions regarding Defendants' state

of mind, each of which must be excluded. ████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████

    None of Dr. Pirrong's conclusions is admissible, because "[i]nferences about the

intent or motive of parties . . . lie outside the bounds of expert testimony." *Rezulin*, 309 F. Supp.

2d at 547 (excluding expert testimony "on the intent, motives or states of mind of corporations, regulatory agencies and others"); *see also*, *e.g.*, *Mirena IUD*, 169 F. Supp. 3d at 479 (excluding opinions that "impermissibly speculate on [company's] or [regulator's] state of mind or intent").

## CONCLUSION

Defendants respectfully submit that, for the foregoing reasons, the Court should exclude the expert testimony of Dr. Craig Pirrong in its entirety.


Dated:  November 18, 2019          Respectfully submitted,
        New York, New York

                                   */s/Stephen Ehrenberg*
                                   Stephen Ehrenberg (ehrenbergs@sullcrom.com)
                                   William H. Wagener (wagenerw@sullcrom.com)
                                   Katherine L. Bagley (bagleyk@sullcrom.com)
                                   Harry F. Murphy (murphyh@sullcrom.com)
                                   SULLIVAN & CROMWELL LLP
                                   125 Broad Street
                                   New York, New York  10004
                                   Telephone:  (212) 558-4000
                                   Facsimile:  (212) 558-3588


Kenneth M. Raisler
*Of Counsel*                       *Attorneys for Defendants*

**APPENDIX A – DR. PIRRONG'S LEGAL OPINIONS AND OPINIONS REGARDING STATE OF MIND**



---

[1]      Citations to "Ex. _" are to exhibits to the Declaration of William H. Wagener, dated November 18, 2019, submitted herewith.

