USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED: __2/15/2022__

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------- x
IN RE: TERM COMMODITIES COTTON　　　　:
FUTURES LITIGATION,　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　　　　　　:　　**OPINION & ORDER**
THIS DOCUMENT RELATES TO ALL MEMBER　:
CASES OF THIS ACTION:　　　　　　　　　　　　　　:　　MASTER DOCKET
　　　　　　　　　　　　　　　　　　　　　　　　　　　　:
12-CV-5126　　　　　　　　　　　　　　　　　　　　　:　　12-CV-5126 (ALC)(KNF)
12-CV-5269　　　　　　　　　　　　　　　　　　　　　:
12-CV-5334　　　　　　　　　　　　　　　　　　　　　:
12-CV-5380　　　　　　　　　　　　　　　　　　　　　:
12-CV-5470　　　　　　　　　　　　　　　　　　　　　:
12-CV-5563　　　　　　　　　　　　　　　　　　　　　:
12-CV-5732　　　　　　　　　　　　　　　　　　　　　:
------------------------------------------------------------------- x

**ANDREW L. CARTER, JR., District Judge:**

　　　　Plaintiffs Mark Allen and Brian Ledwith (together, "Plaintiffs") bring this putative class action on behalf of a proposed class of traders who lost money when prices in the cotton futures market increased unexpectedly in 2011. Plaintiffs claim that Defendants, Louis Dreyfus Commodities B.V., Louis Dreyfus Commodities Cotton LLC (a/k/a Allenberg Cotton Company), LDC Holdings Inc., Term Commodities, Inc., Louis Dreyfus Commodities LLC, and Joseph Nicosia (collectively, "Defendants") unlawfully manipulated the price of cotton futures by unreasonably and uneconomically demanding delivery of certificated cotton in fulfillment of futures contracts in conjunction with other manipulative behavior. As a result of Defendants' market conduct, Plaintiffs argue they suffered losses in liquidating their positions in the May and July 2011 Cotton No. 2 futures contracts. Plaintiffs now move for class certification. Both parties move to seal documents filed in connection with the motion for class certification.

　　　　For the reasons that follow, the Court finds that the proposed class meets the requirements of Rule 23(a) and the relevant requirements of Ruel 23(b) of the Federal Rules of Civil Procedure. Plaintiffs' motion is granted.

## BACKGROUND

### A. Factual Background

The Court assumes familiarity with the particularities of this dispute and briefly recites facts relevant to the pending motion. These facts are taken directly from the Court's prior ruling on Defendants' motion for summary judgment.[1]

> Plaintiff Mark Allen was hired by Glencore Grain B.V. ("Glencore") in 2009. UMF ¶1. Mr. Allen was the head cotton trader at Glencore during the period from March 2011 through July 2011. UMF ¶2. Glencore was one of the world's largest commodities firms during the period from March 2011 through July 2011 but was a relatively small player in the cotton market at the time. UMF ¶3. While Mr. Allen was trading futures on behalf of Glencore, he was also trading using his personal account, and his claims in this case arise from his personal transactions. UMF ¶4–5.
>
> Plaintiff Brian Ledwith was a derivatives trader at Omog Trading during the period from March 2011 through July 2011. UMF ¶7. Mr. Ledwith traded in both the May and the July 2011 ICE Cotton No. 2 futures contracts. UMF ¶8.
>
> Defendant Louis Dreyfus Commodities B.V. "trades and markets commodities, including cotton, on an international basis." Third Consolidated Amended Complaint ("TCAC") (ECF No. 484) at ¶12. The remaining corporate Defendants are all subsidiaries, affiliates, or clearing members for Louis Dreyfus Commodities B.V. Defendant Louis Dreyfus Company Cotton LLC (known during 2011 as LD Commodities Cotton LLC) (a/k/a Allenberg Cotton Co.) was one of, if not the, largest cotton merchants in the United States and throughout the world during the relevant time period from March 2011 through July 2011. UMF ¶24. Defendant Joseph Nicosia was Executive Vice President of Louis Dreyfus Commodities LLC and Chief Executive Officer of Allenberg Cotton Company. UMF ¶25.

Ruling at 13.

> The crux of Plaintiffs' allegations is that Defendants intentionally and uneconomically took the largest ratio of deliveries of physical cotton to the amount of certificated supplies in the history of ICE cotton futures trading, which exacerbated existing market congestion and caused the contract prices to climb—i.e., Defendants "squeezed" the market. As part of this alleged scheme, Defendants acted uneconomically by (1) failing to re-tender cotton, which further depleted deliverable supplies and further inflated prices, TCAC at ¶42; (2) decertificating all of the cotton they received delivery on in the May 2011 Contract, id.; and (3) refusing cheaper cotton from the cash market, id. ¶¶61. The culmination of this uneconomic activity was that the deliverable supply was too low to satisfy Defendants' positions through delivery, which resulted in shorts having to liquidate their positions at prices greater than what physical cotton could be sold for in the cash market. Id. ¶¶ 51, 61(e).

---

[1] For a more detailed recitation, see generally *In re Term Commodities Cotton Futures Litig.*, No. 12-CV-5126 (ALC), 2020 WL 5849142 (S.D.N.Y. Sept. 30, 2020).

> According to Plaintiffs, Defendants knew that lengthy warehouse loadout delays would impact market participants who sought to purchase cotton stored in cash market warehouses for delivery to ICE warehouses to satisfy May 2011 cotton futures contracts. UMF ¶280. Indeed, Plaintiffs allege that Defendants themselves claimed that "we are only able to find very limited amounts of cotton in the cash market" in their request to ICE for a notice period exemption for the March 2011 Contract. UMF ¶¶ 273, 283. Accordingly, Defendants knew that it would be difficult to make a large number of deliveries on the May 2011 Contract, and thus that a large stopper in the May 2011 Contract could increase the inversion between the May Contract price and the July Contract price. UMF ¶287.
>
> Plaintiffs allege that Defendants manipulated the market by making large additions to their May Contract long positions and July Contract short positions to hold an approximately balanced bull spread position. UMF ¶295. 6 These additions peaked with a 3,093,200 bale long position in the May Contract. UMF ¶296. Defendants made these purchases when the rest of the long side of the open interest in the May Contracts was, on the other hand, generally decreasing their long positions. UMF ¶298. This, along with Defendants' slower rate of liquidation, caused their percentage market share of the May Contract long positions to grow from 25.7% on March 30 to 99.4% on April 25. UMF ¶299. As Defendants' percentage market share of the open interest in the May Contract increased to the point where Defendants held more than 99% of the long open interest, the spread between the price of the May Contract and the price of the July Contract generally tended to increase as well. UMF ¶300. Defendants' large late buying deprived the shorts of liquidity to exit the positions at market balanced prices. UMF ¶334. During the delivery period for the May Contract, Defendants took 99%+ of the deliveries made on the May Contract. UMF ¶348. Plaintiffs allege that Defendants made approximately $55.1 million in trading profits from March 30 to May 6, 2011 as a result of Defendants' spread position that was long the May 2011 Contract and short the July 2011 Contract. UMF ¶350.
>
> Plaintiffs allege that Defendants' conduct during the July 2011 contract was substantially similar to their conduct during the May 2011 contract. Between May 23 and June 20, Defendants were net buyers of 1,797,700 bales of July Contracts. UMF ¶407. Between June 6 and June 20, Defendants were net buyers of 1,054,200 bales of July contracts. UMF ¶408. Defendants' share of the long open interest in the July Contract increased from -.10 percent on June 3 to 72.19 percent on June 24, 2011. UMF ¶409. Plaintiffs allege that Defendants' large late buying deprived shorts of liquidity to exit/buy out of the contract. ¶415. Between June 3 and June 24, 2011, the inversion between the July Contract price and the October Contract price increased from 14.03 cents per pound to 38.3 cents per pound. UMF ¶416. Finally, between June 14 and July 5, the July Contract price was much higher than the cash market price, but on July 6 and 7, the July Contract price crashed by approximately 20 cents per pound. UMF ¶¶ 423–24.

Ruling at 16–18.

### B. Proposed Class Definition

Plaintiffs seek to certify the following class:

> All persons, corporations and other legal entities that (a) purchased between March 30 and May 6, 2011 a May 2011 Contract in order to liquidate a short position in such contract, including short positions held as part of spread positions; or (b) contracted to purchase cotton on call based on the May 2011 Contract price, and set the price on this contract between March 30 and May 6; or (c) purchased between June 7 and July 7, 2011, a July 2011 Contract in order to liquidate a short position therein, including short positions held as part of spread positions; or (d) contracted to purchase cotton on call based on the July 2011 Contract price, and set the price on this contract between June 7 and July 7, 2011.
>
> Excluded from the Class are Defendants, any parent, subsidiary, affiliate, agent or employee of any Defendant, and any co-conspirator.

Pls.' Mem. at 1 n.2

### I.   Motion for Certification of Proposed Class

### A. Legal Standard

Rule 23 of the Federal Rules of Civil Procedure governs class certification. That is, plaintiffs must demonstrate that "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). To meet the requirements of Rule 23(a), "plaintiffs in the proposed class must demonstrate that they satisfy four requirements: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation." *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 244 (2d Cir. 2007).

In addition to the requirements of Rule 23(a), plaintiffs must demonstrate that a class is maintainable under Rule 23(b). Plaintiffs move for certification pursuant to Rule 23(b)(3). Under Rule 23(b)(3), the court must decide whether "questions of law or fact common to the

4

members of the class predominate over any questions affecting only individual members," and whether a class action "is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b).

### B. Numerosity Under Rule 23(a)

The numerosity requirement in Rule 23(a)(1) does not mandate that joinder of all parties be impossible—only that the difficulty or inconvenience of joining all members of the class make use of the class action appropriate. *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 244–45 (2d Cir. 2007). Although, there is no bright line rule setting a requisite number of class members for certification, "numerosity is presumed for classes larger than forty members." *Pa. Pub. Sch. Employees' Ret. Sys. v. Morgan Stanley & Co.*, 772 F.3d 111, 120 (2d Cir. 2014).

The Second Circuit has held that "the numerosity inquiry is not strictly mathematical." *Id.* District courts "must take into account the context of the particular case, in particular whether a class is superior to joinder based on other relevant factors including: (i) judicial economy, (ii) geographic dispersion, (iii) the financial resources of class members, (iv) their ability to sue separately, and (v) requests for injunctive relief that would involve future class members." *Id.*

Plaintiffs seek to establish numerosity by deducing a class size based on the number of large traders in the May and July contracts. In the proposed class period, ninety-six larger traders held contracts for cotton, and large traders are only a fraction of the number of traders present in the class period. Then, Plaintiffs argue, the actual number of traders is undoubtedly sufficient to meet the numerosity requirement. Other courts in this district have used this method in finding the requisite class size on a motion for class certification. *See, e.g.*, *In re Amaranth Natural Gas Commodities Litigation*, 269 F.R.D. 366, 379 (S.D.N.Y. 2010) (finding numerosity where record

5

showed that there were "approximately one thousand large and floor traders during the [c]lass [p]eriod."); *In re Natural Gas Commodities Litigation*, 231 F.R.D. 171, 179 (S.D.N.Y. 2005) (finding numerosity where the record showed almost 400,000 open futures contracts at the end of the proposed class period and almost 200 large traders holding positions on the exchange in question). The Court concludes that Plaintiffs have made a sufficient showing to meet Rule 23(a)'s numerosity requirement.

### C.  Commonality Under Rule 23(a) and Predominance Under Rule 23(b)(3)

"The commonality requirement is met if plaintiffs' grievances share a common question of law or of fact," *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 245 (2d Cir. 2007), "truth or falsity [of which] will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. at 350. Plaintiffs need only "demonstrate that the class members 'have suffered the same injury." *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015) (internal quotation marks and alterations omitted). That is, "factual differences in the amount of damages, date, size, or manner of purchase, the type of purchase, the presence of both purchasers and sellers . . . will not defeat class action certification where plaintiffs allege that the same unlawful course of conduct affected all member of a class." *Sumitomo*, 182 F.R.D. at 92.

"The predominance requirement of Rule 23(b)(3) tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010) (internal quotation marks and citations omitted). Plaintiffs must demonstrate that "resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and [that] these particular issues are *more substantial* than the issues subject only to individualized proof."

*Moore v. PaineWebber, Inc.,* 306 F.3d 1247, 1252 (2d Cir.2002). Predominance does not require the absence of individualized damages, but plaintiffs' damages methodology "must actually measure damages that result from the class's asserted theory of injury." *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 407 (2d Cir. 2015).

    i.    *Common Questions of Law and Fact Exist Between May 2011 and July 2011 Contracts*

Plaintiffs argue that common questions of law exist because all potential class members must prove manipulation under Commodities Exchange Act and monopolization under the Sherman Act. Proof of manipulation will depend on the fact-finder's determinations regarding Defendants' course of conduct in the May 2011 and July 2011 Contracts.

Defendants contend that the episodic nature of the conduct at issue forces the Court to make individualized evaluations for each trader in the proposed class. They cite to *In re Aluminum Warehousing Litigation*, 336 F.R.D. 5 (S.D.N.Y. 2020). In *Aluminum*, plaintiffs sued aluminum warehouse owners for allegedly fixing aluminum prices over a six-year period. The plaintiffs in *Aluminum* argued that even though they did not buy aluminum directly from the defendants, the conduct had a knock-on effect in the aluminum market. The issue in *Aluminum* was whether the defendants conduct had *any* effect at all on each of the pricing in plaintiffs' contracts. Here, however, Plaintiffs are not alleging a scheme that had an individualized effect on each class member; rather, Defendants' conduct affected all traders in the May 2011 and July 2011. No individualized inquiry is required to prove whether the alleged squeeze affected the availability of cotton on the market during the relevant period.

The Court has previously held that Plaintiffs' claims fall under the persistent suppression theory, recognizing the alleged market squeeze in the May 2011 and July 2011 Contracts as one

manipulative scheme. *See In re Term Commodities Cotton Futures Litig.*, No. 12-CV-5126 (ALC), 2020 WL 5849142, at *39 (S.D.N.Y. Sept. 30, 2020).

    ii.       *Economic Diversity Among Traders Does Not Defeat Commonality or Predominance*

Defendants argue that Plaintiffs' proposed class will include traders with diverging economic interests, namely long traders, short traders, and hedgers. Defendants' economic interest argument largely goes to the calculation of damages, arguing that, for example, a hedger may have taken a short position to minimize risk of their physical position. However, "all class members have a common interest in pursuing the largely mathematical enterprise at establishing a correlation between [Defendants] positions and prices." *Sumitomo*, 182 F.R.D. at 92; *see also*, *Amaranth*, 269 F.R.D. at 381 (noting that despite complex calculation the inclusion of net long or short positions "can be determined objectively through mechanical calculation"); *Natural Gas*, 231 F.R.D. at 180 (noting that "[a]ll class members will have to engage in the same detailed discovery to compile a common body of data").

Defendants further argue that the inclusion of traders and hedgers who did not suffer a net loss, results in uninjured class members. This risk, they argue, demonstrates that individual inquiries into damages will predominate over class-wide inquiries. Defendants rely on *In re LIBOR-Based Financial Instruments Antitrust Litigation*, 299 F. Supp. 3d 430 (S.D.N.Y. 2018) and *Tyson Foods v. Bouaphakeo*, 577 U.S. 442 (2016), to support the proposition that the inclusion of uninjured class members should lead to a denial of certification. This reliance is misplaced.

The *LIBOR* court considered the certification of three distinct classes, which all presented a significantly greater degree of complexity than this action. *See generally LIBOR*, 299 F. Supp. 3d at 539, 551 569, 590 (discussing netting requirements and the various types of traders in each

of the four proposed classes). The court denied three of the four proposed class actions and certified the final class (OTC action) only as to the antitrust claims in that action." *Id.* at 459. The court noted that the arguments against predominance raised by the OTC defendants went to "the assessment of what amount of damages the class member has suffered and whether that amount of damages is greater than zero." *Id.* at 595. The court held that these arguments implicated only the individualized damages and were insufficient to support a denial of class certification. *Id.*

In *Tyson Foods*, The Supreme Court declined to opine on "whether uninjured class members may recover" damages or "whether [the proposed method] or some other methodology will be successful in identifying uninjured class members" because these were not questions presented on petition for certiorari. *Tyson Foods*, 577 U.S. at 461.

Plaintiffs are only required to demonstrate that "their damages stemmed from the defendant's actions that created the legal liability." *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 88 (2d Cir. 2015). Moreover, the complexity of the damages calculation is not a sufficient bar to certification at this stage in the litigation. *See Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 407 (2d Cir. 2015) (noting that the presence of individualized damages by itself is not enough to bar class certification under Rule 23(b)(3)); *see also Amaranth*, 269 F.R.D. at 385 n.133 (collecting cases).

    iii.    *Large Traders Do Not Defeat Predominance*

The Parties acknowledge that a substantial share of the proposed class will consist of large traders. Defendants contend that these traders are subjected to individualized inquiries and defenses that threaten to overwhelm the litigation. Defendants argue that these traders were better positioned to ensure delivery of physical cotton in satisfaction of their short futures

position and that failure to prepare to delivery was irresponsible.  Def. Reply at 5.  These arguments raise questions of proximate cause, the answers to which are properly determined by the fact-finder at trial.  *See* 2020 WL 5849142, at *33-34 (finding that "a reasonable jury could conclude that Defendants were the proximate cause of the artificial prices in the cotton futures market during the relevant" period).

### D. Typicality Under Rule 23(a)

Typicality "requires that the claims of the class representatives be typical of those of the class."  *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 245 (2d Cir. 2007).  A putative class satisfies this requirement "when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability."  *Id.*  "Class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation."  *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 59 (2d Cir. 2000).  But "[A] representative may satisfy the typicality requirement even though that party may later be barred from recovery by a defense particular to him that would not impact other class members."  *Natural Gas*, 231 F.R.D. at 184 (quoting *In re Sumitomo Copper Litig.*, 182 F.R.D. 85, 95 (S.D.N.Y. 1998)).

Defendants argue that Plaintiff Allen is not typical of class members because he is subject to unique defenses.  Allen, through his role at Glencore, was the subject of an ICE investigation resulting from his own conduct during the class period.  The mere existence of a unique defense does not render a named plaintiff atypical of a putative class member.  *See, e.g., Natural Gas*, 231 F.R.D. (finding typicality where defendants raised unclean hands and credibility defenses); *Sumitomo*, 182 F.R.D. at 95 (finding typicality where defendants raise a failure to mitigate

10

defense). The Court concludes that the potential defenses raised against Allen are not so core as to "become the focus of the litigation."

### E. Adequacy Under Rule 23(a)

Adequacy requires that the class representatives "will fairly and adequately protect the interests of the class." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 267 (2d Cir. 2006) (internal quotation marks omitted). To determine adequacy, courts evaluate "whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009). "Class certification may properly be denied where the class representatives have so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys." *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1077–78 (2d Cir. 1995) (quotation marks and alterations omitted). Courts may also consider "the honesty and trustworthiness of the named plaintiff." *Savino v. Computer Credit, Inc.*, 164 F.3d 81, 87 (2d Cir. 1998).

   *i.   Mark Allen*

Defendants contend that Allen is an inadequate representative because his alleged misconduct in this litigation indicates a lack of integrity and trustworthiness. Defendants allege that Allen misappropriated documents from his former employer and that those documents go to the core of this action. Allen left Glencore in September 2011. In his December 3, 2015 deposition, he testified that he only discovered the documents in mid-2015. *See* ECF No. 599-9 at 168:4-174:6. Allen also received internal Glencore documents from a former colleague who

was still employed at Glencore at the time. *See id.* Allen further testified that these documents were not used at any stage in this litigation. *See id*. at 174:7-16.

Although Defendants argue that Allen's conduct goes to the heart of the action, the alleged misappropriation was discovered more than five years ago and has not been a central issue in this action. The Court finds that Allen is an adequate representative for the absent class members of the putative class.

    ii.    *Brian Ledwith*

Defendants contend that Ledwith is an inadequate class representative because he has made little attempt to oversee class counsel and familiarize himself with the issues in the case. In his June 21, 2019 deposition, Ledwith did not know the name of the Plaintiffs' expert or the content of his report. *See* ECF No. 599-4 at 94:18-95:5, 226:8-227:10. He was not familiar with the briefing in the various motions made before this Court, *see id.* at 93:20-94:6, 96:15-21, 98:5-8, 146:3-14; had not read the previous opinions of this Court, *see id.* at 94:7-13,153:21-23; and had not reviewed any of the documents produced in this case besides his own, *see id.* at 106:20-107:14. Ledwith also appeared to be unsure whether he had reviewed the any of the various iterations of the complaint, *see id.* at 78:6-9, 93:11-17; whether his attorney had appeared before this Court, *see id.* at 64:16-19; and just whom he seeks to represent in this action. *See id.* at 96:15-97:4. In short, Ledwith "display[ed] an "alarming unfamiliarity with the issues in this action" and had all but abdicated his responsibilities in this action. *Scott v. N.Y.C. Dist. Council of Carpenters Pension Plan*, 224 F.R.D. 357 (S.D.N.Y. 2004). The Court finds that Ledwith is an inadequate class representative.

### F. Implied Requirement of Ascertainability

The Second Circuit recognizes the implied requirement of ascertainability when deciding to certify a putative class. Ascertainability "demands that a class be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." *In re Petrobras Sec.*, 862 F.3d 250, 260 (2d Cir. 2017) (internal quotation marks omitted). Ascertainability is satisfied where a class is "identified by subject matter, timing, and location." *Id.* at 269-70.

Plaintiffs contend, and Defendants do not contest, that the proposed class is sufficiently ascertainable. Plaintiffs proposed class consists of all traders holding position in the May 2011 and July 2011 Contracts. Plaintiffs propose to identify these traders by requiring sworn statements from traders and the records of these trades. The Court finds that the proposed class is sufficiently "defined by objective criteria" and therefore ascertainable. *Petrobras*, 862 F.3d at 264.

### G. Superiority Under Rule 23(b)(3)

Under Rule 23(b)(3), plaintiffs must also demonstrate "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In determining superiority, a court examines Rule 23(b)(3)'s nonexclusive list of factors for consideration. Most important of these factors to this case is the manageability of a class action. Fed. R. Civ. P. 23(b)(3)(D).

Defendants argue that this case would not be manageable as a class action because the parties would dispute whether price increases could be attributable "to world events and market forces or to defendants conduct." Def. Reply at 13 (citing *Gordon v. Hunt*, 98 F.R.D. 573, 575-76 (S.D.N.Y. 1983). The Court is not convinced that this action presents any unique manageability

issues. If, however, these do arise, the Court "may decertify [the] class if it appears that the requirements of Rule 23 are not in fact met. *Mazei v. Money Store*, 829 F.3d 260, 266 (2d Cir. 2016) (citing *Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 572 (2d Cir. 1982)).

## II.    Motions to Seal

The Parties collectively submit motions to seal their submissions, including to seal Plaintiff's Memorandum of Law in Support of their Motion for Class Certification, the Declaration of Ian T. Stoll; Defendants' Memorandum of Law in Opposition to Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification; and the Declaration of William H. Wagener and the exhibits thereto; Plaintiffs' Reply Memorandum Of Law in Further Support of Their Motion for Class Certification; and the Declaration of Ian T. Stoll in Further Support of Plaintiffs' Motion for Class Certification. *See* ECF Nos. 592, 597, 605, 607.[2]

When considering a motion to seal, the court must first determine whether the documents at issue are judicial documents. "In determining whether a document is a judicial record, we evaluate the 'relevance of the document's specific contents to the nature of the proceeding' and the degree to which 'access to the [document] would materially assist the public in understanding the issues before the . . . court, and in evaluating the fairness and integrity of the court's proceedings." *Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*, 814 F.3d 132, 139 (2d Cir. 2016) (quoting *Newsday LLC v Cty. of Nassau*, 730 F.3d 156, 166–67 (2d Cir. 2013)).

If the court determines that the documents in question are judicial documents, then the common law presumption of access attaches. *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d

---

[2] Plaintiffs filed a motion to seal documents support its reply memorandum. *See* ECF No. 605. Plaintiffs later filed a corrected copy of their reply memorandum and an additional motion to seal. As such, Plaintiffs' motion to seal, ECF No. 605 is **DENIED** as moot.

14

110, 119 (2d Cir. 2006). The court must then determine the weight of this presumption. *Id.* "[T]he weight to be given the presumption of access must be governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts." *Id.* "[A]fter determining the weight of the presumption of access, the court must "balance competing considerations against it." *Id.* at 120. In addition to the common law right of access, there is a strong First Amendment presumption of public access to judicial documents and proceedings. *See id.* at 110, 119–20, 123–24. However, court documents may be sealed if "specific, on the record findings are made demonstrating that 'closure is essential to preserve higher values and is narrowly tailored to serve that interest.'" *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 13 –14 (1986) (quoting *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 510 (1984)).

The Parties request the Court seal documents reflecting, *inter alia*, Defendants' market positions, customer information, market research, and confidential business information regarding cotton futures market. Defendants identify five categories of documents in the Parties' Joint Submission:

(1) "Materials reflecting Defendants' physical cotton and cotton futures trading strategies, including specific information reflecting Defendants' precise positions on particular dates and internal communications regarding Defendants' futures trading or physical cotton sales strategies";

(2) "Materials reflecting Defendants' profits and losses, which are non-public because Defendants are privately owned";

(3) "Materials reflecting specific contractual terms regarding purchases and sales of physical cotton";

(4) "Materials reflecting Defendants' customers' identities or information about those customers"; and

(5) "Materials reflecting private information regarding specific individuals, including employment information."

ECF No. 623 ("Joint Submission"), at 5–6.  The Parties also propose redactions of information third parties have designated as confidential or highly confidential information.  The Court has carefully reviewed the Parties' memoranda, Joint Submission, and proposed redactions.  Several proposed redactions cover information that is either publicly available or not confidential.  The Court denies Defendants' request as to the following proposed redactions:

- Exhibit 1 to the Declaration of Ian Stoll:
  - Paragraphs 65 –70 should be limited to the data obtained from the third-party platform.  The current proposed redactions are overinclusive.
  - Paragraphs 71 and 72 as well as their accompanying footnotes should not be redacted to the extent that they reflect information provided by the USDA in its Annual Report on Cotton Price Statistics.
  - Paragraphs 102 and 103 reflect a hypothetical by the Plaintiffs' expert and does not include any information on the Defendants' physical cotton positions.  As such, these paragraphs should be unredacted.
  - Paragraphs 122–27, reflect Plaintiff's expert's conclusions based on data provided by ICE.  The proposed redactions are overinclusive.  The redactions in these paragraphs should be limited to the actual data provided by ICE.
  - Paragraphs 130 and 131 contain information and opinions regarding Plaintiff Allen.  They should not be redacted.
- Exhibit 5 to the Declaration of Ian Stoll:
  - Paragraph 2 proposes redactions of information available in the Parties' other submissions.  The proposed redaction in Paragraph 2 quotes Paragraphs 3, 131 – 34 of the Expert Report of Matthew A. Evans, Exhibit 16 to the Declaration of William H. Wagener.  Paragraph 3 of the Evans Report is not redacted.
  - Paragraph 3, 191–92 proposes redactions which cite to unredacted material available in the Evans Report.  Additionally, the information is included in the Court prior opinion in this action.  *See In re Term Commodities Cotton Futures Litig.*, No. 12-CV-5126 (ALC), 2020 WL 5849142, at *26 (S.D.N.Y. Sept. 30, 2020).
  - Paragraphs 191 –92 propose redactions to information which paraphrases unredacted portions of the February 2016 Amended Expert Report of Dr. Craig Pirrong, Exhibit 4 to the Declaration of William H. Wagener.
  - Paragraphs 196 –203 propose redactions that express the Plaintiff's expert's opinion.  To the extent that the Parties seek to redact the exact data (i.e, the numbers) collected from third parties like Cotlook, redactions should be limited to this data.
- Exhibit 16 to the Declaration of William H. Wagener:
  - Paragraph 104 proposes redactions of information which the Parties have already made publicly available.  *See In re Term Commodities Cotton Futures Litig.*, 2020 WL 5849142, at *7, 25.

16

- - o   Paragraphs 140–41, 160 --61 proposes redactions summarizes some of the case key facts and arguments in this case.  They do not include confidential information regarding Defendants' cotton positions.  The Court does not believe this information warrants protection.
  - o   The first two proposed redactions in Paragraph 162 reflect general market strategy, which the Court does not believe is exclusive to the Defendants.

## CONCLUSION

Plaintiffs' motion for class certification is **GRANTED**.  The Parties' motions to seal, ECF Nos. 592, 597, 607, are **GRANTED** in part and **DENIED** in part.  The Parties are hereby **ORDERED** to file redacted versions of the documents referenced above on ECF within 30 days of the filing of this Order.  The Court reserves the right to request additional briefing on whether these documents should remain sealed at a later stage in this litigation.

The Clerk of the Court is respectfully directed to terminate the motions at ECF Nos. 592, 595, 597, 605, 607.

**SO ORDERED.**
**Dated:   February 15, 2022**
        **New York, New York**

                                  **ANDREW L. CARTER, JR.**
                                  **United States District Judge**